1
2
3
4
5
          **UNITED STATES DISTRICT COURT**
6
             **DISTRICT OF NEVADA**
7
8    UNITED STATES OF AMERICA,      )    2:08-cr-140-KJD-GWF
                             )    2:08-cr-141-KJD-GWF
9                   Plaintiff,      )    2:08-cr-163-JCM-GWF
                             )
10    vs.                          )    **REPORT &**
                             )    **RECOMMENDATIONS**
11    CHRISTOPHER SANGALANG, *et al.*,   )
                             )
12               Defendants.     )    **Motions to Dismiss**
     ————————————————————)
13
14          This matter is before the Court on Defendants Sangalang's and Patton's Motion to
15 Dismiss Based on Outrageous Government Conduct[1] (140:67) (141:65)(163:104); the
16 Government's Opposition to Defendants' Motion to Dismiss Indictment Based Upon Alleged
17 Outrageous Government Conduct (140:91)(163:175); Defendant Patton's Supplement to Motion
18 to Dismiss Based on Outrageous Government Conduct (140:102)(163:207); Defendants
19 Sangalang's and Patton's Reply to Post-Evidentiary Hearing Brief (140:196) (141:97) (163:378)
20 (160:384).  The Court conducted hearings on October 2, 2008; November 20, 2008; December
21 19, 2008; December 30, 2008; January 5, 2009; January 6, 2009; January 27, 2009; February 20,
22 2009; March 26, 2009; April 30, 2009; May 6, 2009; May 11, 2090; May 12, 2009; June 24,
23 2009; and August 7, 2009.

24                              **FACTUAL BACKGROUND**
25          This motion concerns the indictments in the following cases:  In Case No. 2:08-cr-140-
26 KJD-GWF, Defendants Christopher Sangalang and Deandre Patton are charged with a
27
28          [1]For purposes of reference, citations to motions and other pleadings are listed by the last
three digits of the case number in which the document is filed with the corresponding docket
entry in that case, i.e. *(140:67) (141:65) (163:104).*

conspiracy to distribute methamphetamine between November 1, 2007 and March 25, 2008.
Defendants are also charged with distribution of controlled substances and aiding and abetting on
February 25, 2008, March 25, 2008 and March 27, 2008 and with unlawful possession of a short-
barreled shotgun, short-barrel rifles, and firearms with obliterated serial numbers and aiding and
abetting on December 13 and 14, 2007.  In Case No. 2:08-cr-141-KJD-GWF, Defendant
Sangalang is charged with the unlawful possession of an unregistered machine gun on or about
January 6, 2008.

In Case No. 2:08-cr-163-JCM-GWF, Defendants Sangalang, Patton, Alfredo Flores,
Roderick Jones[2], Robert Williams and Derek Jones are charged with conspiracy to interfere with
commerce by robbery pursuant to the Hobbes Act, 18 U.S.C. § 1951(a).  This conspiracy
allegedly took place between April 15, 2008 and May 15, 2008.  Defendants are also charged
with conspiracy to possess with intent to distribute cocaine and with possession of a firearm in
furtherance of a drug trafficking crime which also took place between April 15, 2008 and May
15, 2008.

### 1.      Background of the Undercover Operation

The indictments in these cases arise from an undercover sting operation conducted by
agents of the Bureau of Alcohol, Tobacco and Firearms (ATF).  The undercover operation, which
was code named "Sin City Ink" or "Sin City Treace," was conducted at a tattoo parlor, "Hustler's
Tattoo," which the ATF opened and outfitted with video and audio equipment.  The two
principal ATF agents involved in the undercover operation, Peter McCarthy and Mark Gomez,
testified during the evidentiary hearing.  Video and audio recordings of meetings between the
undercover agents and the Defendants were also admitted into evidence.

The undercover operation began in February 2007 with the intention of targeting violent
criminals and street gang members operating in the Las Vegas area.  The operation arose from
Agent Gomez's contact with an individual named Jaime Pedrasa, aka "Fat Cat," who had come

---

[2]Defendant Roderick Jones has pled guilty to Count I of the indictment and has been
sentenced to a term of imprisonment.

1  to the ATF's attention because he purchased multiple firearms.  Agent Gomez discovered that

2  Mr. Pedrasa was a tattoo artist and the agent observed a lot of gang members or "criminal

3  element" in the tattoo shop where Pedrasa worked.  Pedrasa agreed to work as a paid informant

4  for the ATF.   Mr. Pedrasa introduced Agent Gomez to another tattoo artist, Richard Beckworth,

5  aka "Bones," who also agreed to serve as a paid informant.  As a result of Agent Gomez's

6  observations and contacts with Pedrasa and Beckworth, the ATF decided to open Hustler's

7  Tattoo.

8        Agent McCarthy has been employed as an ATF agent since 1991 and previously

9  infiltrated a motorcycle gang and the Aryan Brotherhood.  During the Sin City Ink operation, he

10 played the role of the owner of the tattoo parlor and the head of the illegal weapons and narcotics

11 operation.  Agent Gomez, who was closer in age to most of the targets, played the role of

12 McCarthy's assistant or "right hand man."  Once Hustler's Tattoo opened in September 2007, the

13 undercover agents put the word out through the informants that they were interested in

14 purchasing illegal firearms and narcotics.  Mr. Pedrasa and Mr. Beckworth worked as tattoo

15 artists in the shop and arranged firearms and drug deals between targets and the undercover

16 agents.  Agent Gomez brought the targets into the tattoo parlor office to meet with Agent

17 McCarthy who would then consummate the firearms or narcotics purchases.  The transactions

18 were recorded on audio/video equipment.

19       Agent Gomez testified that the undercover agents would generally go into the tattoo

20 parlor about 6:00 p.m. and hang out until early morning to make contact with gang members and

21 set up purchases of guns and narcotics. He described Hustler's Tattoo as a "clubhouse for the

22 members of the Twenty-Eighth Street gang and their associates."  *12/19/08 Hearing Transcript*,

23 *Docket No. 224,* page 106[3].  The gang members or associates who hung out in the shop regularly

24 smoked marijuana on the premises.  Agents McCarthy and Gomez also testified that the

25 informant Richard Beckworth smoked marijuana on several occasions in the tattoo parlor which

26 was a violation of his informant's agreement.  The agents counseled Mr. Beckworth not to use

27 _____

28       [3]The transcript docket references are to Case No. 2:08-cr-163-JCM-GWF.

3

1    marijuana, but he continued to violate his agreement.  Mr. Beckworth's drug use was reported to

2    ATF management and the decision was made to continue using him as an informant.  *01/05/09*

3    *Hearing Transcript, Docket No. 233*, pages 50-57.

4          Agent McCarthy testified that as part of his role-playing or "street theater," he used an

5    "unwitting informant" to purchase a glass smoking pipe from a head shop.  He used this pipe to

6    smoke a legal herbal substance known as "Wizard Weed" which has an odor substantially similar

7    to that of burning marijuana.  Agent McCarthy testified that he simulated the use of marijuana for

8    two reasons.  First, he wanted to indicate to targets that he was engaged in criminal activity and

9    thereby gain credibility with them and overcome their suspicions.  Second, by feigning the use of

10   marijuana, he would be able to avoid the targets' offers to use other drugs, such as a

11   methamphetamine, without arousing their suspicions.  *12/19/08 Hearing Transcript, Docket No.*

12   *224*, pages 108-109.  Defendants contend, however, that Agent McCarthy actually used

13   marijuana or some other illegal controlled substance during the undercover operation.

14          **2.   Initial Meeting Between Agents and Defendants Sangalang and Patton**

15          Agent McCarthy and Agent Gomez met Defendants Christopher Sangalang and Deandre

16   Patton on November 1, 2007 as a result of "street theater" that the agents engaged in to make the

17   targets believe they were criminals.  Agent McCarthy testified that the agents told Paul Ashley,

18   who is charged in another indictment arising out of the operation, that they were having problems

19   at a local bar and wanted to hire some of his gang members to "just go with us to this bar, to be

20   seen with us at the bar, and to intimidate people in the bar that we were having trouble with."

21   *12/19/08 Hearing Transcript, Docket No. 224*, page 113.  Mr. Ashley, Mr. Sangalang, Mr.

22   Patton, Mr. Beckworth, and two other individuals showed up at the bar -- "Mr. D's."  Defendant

23   Sangalang spoke mostly with Agent Gomez, but Agent McCarthy did overhear him tell Agent

24   Gomez that he was affiliated with the  "Seven Four Hoover Crips" gang out of Los Angeles

25   which Agent McCarthy testified is a very large violent street gang that is involved in armed

26   robberies and murders.  *Id.* at pages 114-115.

27          During the meeting at Mr. D's, Mr. Beckworth told Agent McCarthy that Mr. Patton had

28   a firearm that he wanted to sell, but that he needed the money to go get it.  Agent McCarthy gave

4

Mr. Beckworth the money.  Mr. Beckworth and Defendant Patton returned about a half hour later.  Beckworth informed the agent that "Patton wants to see you in the men's room."  Agent McCarthy, Beckworth and Patton proceeded to the men's room where Beckworth lifted up his shirt and revealed a firearm in his waistband.  Agent McCarthy testified that "I took the pistol and then I started talking to -- then Mr. Patton started talking about the firearm as if it was his, and I talked about the price, bringing down the prices, and he advised me he didn't know me well enough;  we'd have to do some more deals before he'd start cutting the price."  *Id.*, pages 117-118.

Agent Gomez testified that he was introduced to Defendant Sangalang by Mr. Beckworth. *1/06/09 Hearing Transcript Docket No. 234*, pages 99-100.  Defendant Sangalang told Agent Gomez that he believed Mr. Pedrasa, who was not present, was an informant and he warned Agent Gomez about Pedrasa.  Agent Gomez testified that Sangalang, Pedrasa and Beckworth had previously worked together at another tattoo parlor.  *Id.*, pages 127-129.  Mr. Sangalang identified himself as a member of the Hoover Crips and introduced Defendant Patton as a "B," meaning that he was a "Blood," i.e., a gang member.  *Id.*, page 129.   Agent Gomez also testified that the 74 Hoover Crips gang is an extremely large violent gang in Los Angeles.  *Id.*, page 131. During this initial meeting, Mr. Sangalang continually bragged about his gang affiliation and stated "We're all killers."  *Id.*, page 133.  Audio recordings of the meeting were admitted into evidence.  *Government's Exhibit "4."*  The voices on the recordings are muffled and in some instances drowned out by background noise.

### 3.   Firearm Purchases from Defendants Sangalang and Patton

Following the November 1, 2007 meeting, the agents engaged in firearms purchases from Defendants Sangalang and Patton.  Agent McCarthy testified that the agents purchased a stolen Uzi pistol from Mr. Sangalang  on November 7, 2007.  On December 13, 2007, the agents purchased three firearms from Mr. Sangalang and Mr. Patton, including a short-barrel or sawed-off shotgun.  On December 14, 2007, the agents purchased three short-barrel rifles with obliterated serial numbers from Mr. Sangalang and Mr. Patton.  On December 19, 2007, the agents purchased another firearm with an obliterated serial number from Mr. Sangalang.  On

1  January 7, 2008, the agents purchased a fully automatic machine gun from Sangalang.  *12/19/08*

2  *Hearing Transcript (Docket No. 224)*, pages 119-121.

3        Agent Gomez testified that the firearm purchases from Mr. Sangalang and Mr. Patton

4  were set up through informant Richard Beckworth.  *01/06/09 Hearing Transcript, Docket No.*

5  *234*, pages 135-154.  In regard to the purchase of the stolen Uzi pistol, Agent Gomez told Mr.

6  Beckworth to tell Mr. Sangalang that the agents would be at the tattoo shop at a specified time if

7  he wanted do to the transaction.  Mr. Beckworth showed up with Mr. Sangalang who was

8  carrying a bag which held the stolen Uzi.  Mr. Sangalang then conducted the transaction with

9  Agent McCarthy in the tattoo parlor office.  *Id.*, page 136.  The firearm purchase from Sangalang

10  and Patton on December 13, 2007 was also arranged through Mr. Beckworth who was present in

11  the tattoo parlor when the transaction took place.  On this occasion Mr. Sangalang removed a bag

12  containing the firearms from the trunk of Mr. Patton's vehicle.  He then brought firearms into the

13  office and sold them to Agent McCarthy.  *Id.*, pages 140-141.  On December 14, 2007, the agents

14  purchased three short-barrel rifles with obliterated serial numbers from Sangalang and Patton.

15  *Id.*, page 142-143.  Prior to this purchase, Agent Gomez received a call from Mr. Beckworth who

16  stated that Sangalang and Patton had more guns that they wanted to sell.  *Id.*, page 144.  During

17  the December 14th transaction, Mr. Patton and Mr. Sangalang stated that they had a cousin in

18  Atlanta who had access to fully automatic weapons.  Patton and Sangalang attempted to set up a

19  deal with the undercover agents to traffic in firearms from Atlanta to Las Vegas.  *Id.*, pages 145-

20  146.

21        Agent Gomez assumed that the purchase of a handgun with an obliterated serial number

22  and a shotgun from Defendant Sangalang on December 19, 2007 was also facilitated by Mr.

23  Beckworth.  *Id.*, pages149-150.  In regard to the purchase of a fully automatic firearm from

24  Defendant Sangalang on January 7, 2008, Agent Gomez testified that it was his understanding

25  that Louis Acosta, a leader of the 28th Street gang, was in possession of this weapon.  Mr. Acosta

26  contacted Mr. Beckworth, who in turn contacted Mr. Sangalang, who agreed to sell the weapon

27  to the undercover agents.  *Id.*, page 154.

28  . . .

1    Agent Gomez testified that during November and December 2007, Mr. Sangalang did not

2    come to the Hustler's Tattoo parlor except to conduct the firearms transactions.  Mr. Sangalang

3    would not come to the shop when Mr. Pedrasa was there because of his suspicion that Pedrasa

4    was an informant.  In January or February 2008, Mr. Pedrasa started working at another tattoo

5    shop and Mr. Sangalang started hanging out at Hustler's Tattoo.  *01/06/09 Hearing Transcript,*

6    *Docket No. 234*, page 156.  The agents offered to allow him to work as a tattoo artist in the shop.

7    Initially, Sangalang worked there "on and off" and then daily.  *Id.*, page 157  Agent Gomez

8    testified that he developed a close personal relationship with Mr. Sangalang once he started

9    working in the shop.   They went to local strip clubs in the area and Agent Gomez helped

10   Sangalang move his stuff into the shop.  Once Mr. Sangalang began working in the shop,

11   Defendant Patton also began hanging around the shop on a daily basis and Agent Gomez also

12   developed a personal relationship with him.  *Id.*, pages 157-158.

13          4.      Narcotics Purchases from Defendants Sangalang and Patton

14          Agent Gomez testified that Mr. Sangalang and Mr. Patton repeatedly tried to get the

15   undercover agents to purchase methamphetamine from them.  Mr. Sangalang claimed that he had

16   sources for narcotics in Hawaii and Atlanta.  The undercover agents initially declined to purchase

17   narcotics based on ATF management's decision that the operation would focus on illegal

18   firearms and because of the expense involved in purchasing illegal narcotics.  *01/06/09 Hearing*

19   *Transcript, Docket No. 234*, pages 159-160.  The agents eventually received authorization to

20   purchase narcotics from the Defendants.  On February 25, 2008, Agent McCarthy purchased

21   seven grams of methamphetamine from Defendant Sangalang which he stated was a sample of

22   what he could provide.  Mr. Sangalang claimed that his sources could provide large quantities of

23   narcotics.  *Id.*, pages 162-163.

24          The agents subsequently purchased one and one-half ounces of methamphetamine from

25   Sangalang and Patton on March 25, 2008.  During that transaction, the agents told Sangalang and

26   Patton that they were interested in purchasing large quantities of methamphetamine.  On March

27   26, 2007, Agent Gomez had a phone conversation with Defendant Sangalang in which they

28   arranged the purchase of four ounces of methamphetamine on March 27th.  On March 27, 2009,

7

1    the agents purchased 120 grams of methamphetamine from Defendant Sangalang and Patton.  *Id.*,

2    pages 176-178.  Following this transaction Defendant Sangalang showed Agent Gomez a

3    handgun that he kept in a drawer in his tattoo bay and "bragged" about the firearm.  *Id.*, page

4    178.  Agent Gomez testified that to his knowledge Mr. Beckworth was not involved in the

5    agents' purchases of narcotics from Sangalang and Patton.  He stated that once Sangalang and

6    Patton began working or regularly hanging out in Hustler's Tattoo, there was no further

7    involvement between Beckworth and Sangalang and Patton.  *Id.*, pages 167-169.

8            Prior to the March 25, 2007 narcotics transaction, the Government had obtained an order

9    for a pen register and trap and trace device on Mr. Sangalang's and Mr. Patton's cell phones.

10   Defendant Sangalang's wife or fiancé worked at the telephone company and was reportedly

11   informed by a supervisor that law enforcement was monitoring the phones.  Agent McCarthy

12   testified that he learned of this when Defendant Patton's wife came to Hustler's Tattoo and spoke

13   to Defendant Patton.  Mr. Patton turned to Sangalang and advised him to get rid of their phones

14   because they were hot.  Agent McCarthy thereafter confronted Defendant Sangalang in the tattoo

15   parlor office to try to obtain information on how the pen register had been compromised and to

16   also suggest that Sangalang and Patton were responsible for having brought law enforcement

17   attention onto the undercover agents.  During this meeting Agent McCarthy asked Sangalang

18   how old he was.  Sangalang responded 33.  Agent McCarthy told Sangalang that if he wanted to

19   be around when he was 34, then he shouldn't talk on the phone. *01/06/09 Hearing Transcript*

20   *Docket No. 234*, page 23.  Agent Gomez testified that he and Agent McCarthy pretended to be

21   upset with Sangalang and Patton because they had gotten the undercover agents involved in a law

22   enforcement investigation.  He testified that Mr. Sangalang appeared to feel bad about this.

23   Thereafter, Sangalang and Patton were more careful in communicating on the telephone and Mr.

24   Sangalang used code words when he discussed narcotics transactions with the agents.  *Id.*, pages

25   169-175.

26   . . .

27   . . .

28   . . .

1      **5.**     **Development of Robbery Conspiracy Plan Between Undercover Agents and**
2          **Defendants**

3          Agent Gomez testified that Defendant Alfredo Flores began hanging out at Hustler's

4  Tattoo about the same time that Defendant Sangalang started working there.  *01/06/09 Hearing*

5  *Transcript, Docket No. 234*, page 179.  Mr. Flores drove Mr. Sangalang and Mr. Patton to the

6  shop in his automobile almost daily and Agent Gomez believed that they all lived together.  *Id.*

7  Agent Gomez also developed a  personal relationship with Mr. Flores.  *Id.*, pages 178-179.  Mr.

8  Flores hung out at the shop on a nearly nightly basis.  Agent Gomez testified that Flores "was

9  always bragging about his gang affiliation, his crews, he could do this, he could do that."  *Id.*,

10  pages 201-202.  According to Agent Gomez, Mr. Flores stated that he wanted to sell drugs to the

11  undercover agents.  Agent Gomez testified, however, that the agents did not purchase drugs from

12  Flores prior to April 2008 because he appeared to be living with Mr. Sangalang and Mr.

13  Sangalang appeared to be the leader of Patton and Flores.  *Id.*, page 202.

14          Agent Gomez testified that the undercover agents were also dealing with another

15  individual named Donte Reed to whom they had been introduced by informant Jaime Pedrasa.

16  The undercover agents purchased firearms from Donte Reed between February and March 2008.

17  *01/06/09 Hearing Transcript, Docket No. 234*, pages 181-182.  Mr. Reed told the agents that he

18  had previously been involved in home invasions and burglaries and had "a home invasion crew"

19  that was interested in doing a robbery or "lick."  *Id.*  The undercover agents met with Donte Reed

20  in the Hustler's Tattoo office on April 17, 2008 and apparently discussed a home invasion

21  robbery with Mr. Reed.  According to Agent Gomez, Defendant Sangalang appeared to be upset

22  after the agents met with Mr. Reed.  He explained that "everybody" at Hustler's Tattoo knew the

23  agents were conducting firearms deals in the tattoo parlor office and that Sangalang and Patton

24  would get upset when they observed the agents dealing with other individuals.  *Id.*, pages 183-

25  184.  Mr. Sangalang would make statements such as "Why are you dealing with those guys?"

26  "Why are you cutting me out?"  *Id.*, at page 183.

27          According to Agent Gomez, prior to April 18, 2008 Defendant Flores had stated that he

28  had a crew of individuals who were willing to do robberies.  *Id.*, at page 200.  The agents decided

to pitch a home invasion robbery to Mr. Flores.  Agent Gomez further explained:

> But the reason he was pitched is because of his relationship with the undercover agents and, like I said, just the daily -- the dealings that we had done with Sangalang and Patton; he was part of their crew.  Sangalang was kind of pitched simultaneously later that night.  And it was just a continuation of their -- of not only the deals, the narcotics transactions and the firearms transactions, but also the daily bragging.  And, you know, and we had developed a personal relationship with them and  -- that we didn't develop with other defendants.  You know, other defendants would just do deals and leave, and these defendants we developed a personal relationship with, and they kept telling us how bad and how tough they were and all of their gang affiliations.

*01/06/09 Hearing Transcript Docket No. 234*, pages 203-204.

On April 18, 2008, Defendant Flores met with Agent McCarthy and Agent Gomez in the tattoo parlor office to transact a two ounce narcotics deal.  *12/19/08 Hearing Transcript, Docket No.224*, pages 129-130; *01/06/09 Hearing Transcript, Docket No. 234*, page 200; and *Government's Exhibit "8"* (audio/video recording of April 18, 2008 meeting).  After the narcotics transaction was completed, Agent McCarthy asked Mr. Flores if he had a crew or stated that he heard that Flores had a crew.  He then asked Mr. Flores if he was "down for a lick," i.e. willing to do a robbery.  Mr. Flores responded that he was interested depending on the details.  Agent McCarthy stated the undercover agents could not do the robbery because they were known to the prospective victims.  Agent McCarthy then left the room and brought undercover ATF Agent Christopher Bayless into the room to explain the planned robbery.

Upon entering the office, Agent Bayless asked Mr. Flores if he had "maybe a crew" and was "down for a lick or something?"  Mr. Flores responded affirmatively.  Agent Bayless told Mr. Flores that he worked as a courier for a narcotics trafficking organization that shipped narcotics through Las Vegas.  He stated that he picked up shipments of 20-25 kilos of narcotics approximately every three or four weeks from a house in Las Vegas.  He would then transport the narcotics to Chicago.  The location of the house would change each time and Agent Bayless would be notified by phone shortly before the pick-up where it was to occur.  Agent Bayless told Defendant Flores that as a result of the loss of a shipment by an individual whom he had set up to transport a load, Agent Bayless was being required to pay the traffickers $50,000.  He indicated

that he was angered about this and therefore now wanted to "knock them off."  Agent Bayless stated that there were generally two persons present in the "stash house" where the drugs were picked up.  He stated that these individuals were "strapped," meaning they were armed and that they were "hitters."  *Government's Exhibit "8"*

Agent Bayless stated that it was no problem if Mr. Flores did not want to get involved in the robbery.  He stated, however, that if Flores had a crew that were "hitters" and were willing to do this type of robbery, then they could potentially work out a deal.  Mr. Flores again stated he was interested, depending on the circumstances.  Agent Bayless indicated that it would be necessary for the robbers to "rap" him during the robbery to make it appear that Bayless was also a victim.  In response to this, Mr. Flores indicated that everyone would be put down.  Agent Bayless also stated that the persons guarding the drug house might use their weapons to resist and that the robbers would need to be prepared to shoot or kill them.  Mr. Flores appeared to acknowledge this and indicated that he and his crew would be prepared for such an eventuality.  *Id.*

Agent Gomez testified that Mr. Flores had no hesitation about participating in the proposed robbery.  He testified that Mr. Flores made statements such as "we're coming in ready for war,"  "all my boys grew up gang-banging," and that the crew members would "put down" the persons guarding the stash house. *01/06/09 Hearing Transcript, Docket No. 234*, page 205. Defendant Flores also suggested the possibility of "kidnaping" Agent Bayless from the stash house to make it appear that he was a victim.  Agent Bayless agreed that this might be a good idea.  Agent McCarthy also testified that Mr. Flores made such statements during the April 18th meeting.  *12/19/08 Hearing Transcript, Docket No. 224*, pages 128-130.  The meeting ended with Agent Bayless telling Defendant Flores that they would meet again to further develop the robbery plan.

Agent Gomez testified that he discussed the home invasion or stash house robbery pitch with Defendant Sangalang later on April 18, 2008.  In explaining why the pitch was also made to Mr. Sangalang, Agent Gomez testified:

. . .

11

1
2
3
4
5

> Well, because we knew they were one crew, really.  And we knew that Flores would go to Sangalang and talk to him.  In addition, Sangalang was upset that we had talked to Flores, and he was upset that the other crew he had saw in there -- he wanted to know why we were dealing with those guys.  You know, "Why are those guys here?  Why are you doing business with them?"  So, he was upset.  And, so, I told him what we were doing with those guys.  And he said to me, "Well, if they can't get a crew together, I can get a crew together."

6  *01/06/09 Hearing Transcript, Docket No. 234*, page 206.

7       Agent Gomez testified he initially discussed the home invasion plan with Defendant

8  Sangalang during a trip to a store.  Agent Gomez recorded this conversation.  *See Government's*

9  *Exhibit "6."*  The recording supports Agent Gomez's testimony regarding his initial discussion

10  with Defendant Sangalang.  Agent Gomez told Defendant Sangalang that Agent McCarthy was

11  reluctant to involve Sangalang in the planned robbery because of the "heat" that might be brought

12  down on him and also the possibility that the agents would be connected to the robbery.

13  Defendant Sangalang expressed his desire to participate and indicated that he could put a "killer

14  killer crew together."  Defendant Sangalang also stated that his crew had experience doing

15  armored car robberies. *01/06/09 Hearing Transcript, Docket No. 234*, pages 206-213.  Agent

16  Gomez told Defendant Sangalang that he would speak to Agent McCarthy to see if he wanted to

17  include Sangalang in some type of robbery.  According to Agent Gomez, Defendant Sangalang

18  seemed very eager to be involved and was adamant that he could put a crew together.  *Id.*, pages

19  218-219.

20       On April 23, 2008, Agents McCarthy, Gomez and Bayless met with Defendant Sangalang

21  in the Hustler's Tattoo office to discuss the proposed robbery.  Similar to the meeting with

22  Defendant Flores on April 18th, Agent McCarthy initially presented the general idea for the

23  robbery to Mr. Sangalang and inquired whether he was interested in participating.  Agent

24  McCarthy stated that if he was not interested, the discussion would end there.  Defendant

25  Sangalang stated that he was interested.  Agent McCarthy and Sangalang discussed the logistics

26  and complications involved in conducting such a robbery.  Mr. Sangalang stated that he had a

27  crew of individuals who could commit the robbery, but that these individuals might want to be

28  paid something in advance of the robbery.  Mr. Sangalang indicated that he would have more

difficulty selling the robbery to his crew if they would only receive payment after the robbery was completed.   Mr. Sangalang also stated that it might be necessary for him to seek individuals outside his "hood" to commit the robbery so that it could not be traced back to him.   Sangalang indicated, however, that he knew such individuals whom he could potentially recruit.   During this conversation, Agent McCarthy also stated that it might necessary to kill the "inside guy" who would disclose the location of the narcotics traffickers' money stash house that would also be robbed.  Defendant Sangalang appeared to agree with this.   *See Government's Exhibit "4", Video/Audio Recording.* (The sound on this recording is not clear because of background noise. Defendant Sangalang's voice is not clearly audible, but his words can generally be made out on close listening.)

McCarthy and Sangalang then briefly left the office.   Agent McCarthy returned with Agent Bayless who sat behind the desk.   Agent Bayless then explained the proposed robberies. He told Sangalang that he initially didn't think they could rob the "money house," i.e., where drug sale proceeds were located, but the agents had an "inside" person who would provide them with the location of that house so that it could also be robbed simultaneously with the drug stash house.   *Government's Exhibit "4", Video/Audio Recording.*   Agent Bayless stated that he would receive a phone call telling him where the drug stash house was located and that he would be given a 30-minute window in which to make the pick-up.   Agent Bayless stated that there would be 80 to 100 kilograms of narcotics in the drug stash house.   He also stated that the individuals guarding the stash house were armed and would "not give it up because we say so."   He stated that the robbers, however, would have the element of surprise.   There appeared to be mutual agreement between Bayless, McCarthy and Sangalang that it might be necessary to kill the persons in the drug and money stash houses.   Agent Bayless asked Sangalang how many crew members he would need to commit the robberies.   Sangalang indicated three or possibly four for each house.

Agent Gomez testified about various statements that Defendant Sangalang made during this meeting, including the possible need to kill the persons in the stash houses and that some of his crew members had committed armored truck robberies.   *01/06/09 Hearing Transcript, Docket*

1    *No. 234*, pages 233-234.  In response to a statement by Agent Bayless, Mr. Sangalang joked that

2    his gang members would "do it for free" ---"they shoot people for free."  Mr. Sangalang also

3    reportedly stated that after the robbery was committed and the persons were killed, he would

4    leave some drugs in the house and burn it down.  *Id.*, at page 235.  Defendant Sangalang also

5    stated that he did not want to have to kill any of his own people after the robbery.  Mr. Sangalang

6    stated that his crew members were "hitters" which Agent Gomez interpreted as meaning that they

7    were violent criminals.  *Id.*, pages 236-237.  Near the end of the meeting, Defendant Sangalang

8    also stated:  "I did it for colors when I was young.  I might as well do it for something green."

9    According to Agent Gomez, "colors" was reference to Mr. Sangalang's gang affiliation.  *Id.*, at

10   page 238.  Mr. Sangalang also expressed some reservations about Defendant Flores.  Defendant

11   Flores was brought into the room and Mr. Sangalang asked him about his ability to form a crew

12   and who he was thinking about as potential crew members.  *Id.*, page 237-238.  Agent McCarthy

13   gave similar testimony concerning Mr. Sangalang's statements during the April 23, 2008

14   meeting.  *12/19/08 Hearing Transcript, Docket No. 224*, pages 133-134, 141-142.

15          Not all of Mr. Sangalang's statements are clearly audible on the recording.  *Government's*

16   *Exhibit "4".*  The Court's review of the recording, however, appears to support the agents'

17   testimony.  Agents McCarthy and Gomez were present during the meeting and, in addition to

18   reviewing the recording, they also have the benefit of reviewing their reports of investigation

19   prepared after the meeting.  The recording does show that Mr. Sangalang was actively engaged

20   with the undercover agents in discussing the methods and means for conducting the robbery,

21   including the difficulties that might be encountered.

22          Agent Gomez testified that he had a follow-up conversation with Defendant Sangalang on

23   April 25, 2008 about the proposed robbery.  Agent Gomez attempted to record the meeting, but

24   the recorder malfunctioned.  He did, however, prepare a report of the conversation.  *01/06/09*

25   *Hearing Transcript, Docket No. 234*, page 240.  Mr. Sangalang told Agent Gomez that he had

26   started recruiting members for his robbery crew and had chosen individuals for specific roles.  He

27   did not identify any of the crew members.  Agent Gomez and Mr. Sangalang agreed to meet the

28   following week to discuss the robbery.  *Id.*, pages 241-242.

Agent Gomez testified that there was a subsequent meeting between Agent McCarthy, Agent Bayless and Defendant Sangalang in Hustler's Tattoo on May 6, 2008 which was recorded. Agent Gomez was not present during that meeting. *Id.*, page 243. The audio recording of the May 6, 2008 meeting was admitted into evidence as *Government's Exhibit "4BB"*. During this meeting, Agent Bayless stated he was ready to go forward with the robberies the following week. He asked Defendant Sangalang if his crew was ready and would be coming into town. Defendant Sangalang indicated that his crew members were already in Las Vegas. There was further discussion about dividing and laundering the proceeds of the robbery. There was also discussion about using rental vehicles to conduct the robberies and the number of crew members who would commit each robbery. Another meeting occurred on May 7, 2008 at Mr. D's Bar which was attended by Agent McCarthy, Agent Bayless, two other undercover agents and Defendants Sangalang and Flores. Agent Gomez was also not present during that meeting. Agent Gomez was informed that during the May 7, 2008 meeting Agent McCarthy or Agent Bayless told the Defendants that one of the undercover agents with them was the "inside guy" who was to be killed during or following the money stash house robbery. *Id.*, pages 244-246.

Agent Gomez testified that agents again met with the Defendants on May 12, 2008 to discuss the logistics of the robberies. *1/09/09 Hearing Transcript, Docket No. 239*, page 52. Initially, Agents McCarthy, Bayless and Gomez met with Defendants Sangalang, Flores and Patton. Defendant Roderick Jones later joined the meeting. *Id.* Agent Gomez testified that May 12, 2008 was the first occasion that Defendant Patton participated in the robbery planning meetings. *Id.*, page 67. At the beginning of this meeting, there was a discussion among the agents and then between Defendants Patton and Sangalang about whether to kill the "inside guy" at the money house or bring him back to the tattoo parlor or somewhere else to be killed. Defendant Sangalang demonstrated to Defendant Patton how to tie someone up. *Id.*, pages 67-68. Defendant Patton also discussed killing the guards by cutting their throats. *Id.* The video/audio recording of this meeting, *Government's Exhibit "4-1"*, shows that the discussion was led by Agent Bayless with Defendant Sangalang and Defendant Patton actively participating. Defendant Flores was present but remained largely silent. Agent Gomez testified that the

1    Defendants became excited and were laughing and joking about performing the robberies and the

2    associated murders.  *Id.,* pages 69-70.  The recording supports this statement.

3         Once Defendant Roderick Jones joined the meeting, Agent Bayless explained the

4    essentials of the robbery plan to him.  *1/09/09 Hearing Transcript, Docket No. 239*, page 7;

5    *1/26/09 Hearing Transcript, Docket No.249*, page 9.  *See also Government's Exhibit "4-1."*

6    According to Agent Gomez, Defendant Jones agreed to participate in the robbery and he bragged

7    about a prior robbery he had performed.  Defendant Jones also discussed having the robbers pose

8    as police officers and obtaining uniforms for that purpose.  *1/26/09 Hearing Transcript, Docket*

9    *No. 249*, pages 9-10.  Defendant Roderick Jones also discussed cutting the throats of the persons

10   guarding the stash house.  *Id.*, page 32.

11        Agent Gomez testified that the agents again met with the Defendants on May 14, 2009 to

12   finalize the robbery plans.  During this meeting Defendant Roderick Jones stated that he intended

13   to pose as a police officer during the robbery to "freeze" the persons in the stash house.

14   Defendants Robert Williams and Derek Jones were present during this meeting and Defendant

15   Sangalang explained the robbery plans to Defendant Williams.  Defendant Sangalang also told

16   the crew members that if anyone didn't want in, they could leave now.  Defendant Patton

17   discussed how he would kill the "inside guy."  *1/26/09 Hearing Transcript, Docket No. 249*,

18   pages 35-44.  Agent Gomez also testified that following the meeting, he spoke with Defendants

19   Derek Jones and Roderick Jones in the front of Hustler's Tattoo.  During this conversation,

20   Derek Jones and Roderick Jones talked about a prior car-jacking robbery that they had

21   committed.  *Id.*, pages 46-47.

22        On May 15, 2008, the Defendants assembled at Hustler's Tattoo in preparation to commit

23   the robberies.  Also present were Agents McCarthy, Bayless, Gomez, Zayas and another

24   undercover agent.  *1/26/09 Hearing Transcript, Docket No. 249*, page 47-48.  Agent Gomez

25   testified that the Defendants were dressed in black, except for Defendant Sangalang.  The

26   Defendants brought their own firearms and had two bags of zip ties and a radio scanner.  Derek

27   Jones also had a police badge.  *Id.*, pages 49-50.  Agent McCarthy also testified that the

28   Defendants had ski masks.  *12/19/07 Hearing Transcript, Docket No. 224*, page 144.  Agent

1    Gomez testified that the agents had their own ATF issued firearms but did not bring any other

2    firearms to the meeting.  Agent McCarthy asked the Defendants if they had their "tools", i.e.

3    firearms.  Defendants Sangalang and Patton responded that they had theirs.  Agent McCarthy

4    stated that he could get more weapons.  Agent Gomez testified, however, that that was just street

5    theater and the agents did not obtain or provide any weapons.  *Id.*, page 50.

6           The Defendants and the undercover agents then drove to the rendevous location where

7    Defendants believed they would get into two rental vans to go to the robbery locations.  Instead,

8    an ATF SWAT team was waiting to arrest the Defendants.  Agent McCarthy testified that

9    undercover agents drove to the rendevous location in a Chevrolet Suburban and the Defendants

10   followed them in three vehicles.  None of the undercover agents rode with the Defendants.

11   *12/19/07 Hearing Transcript, Docket No. 224*, page 151.  Once the Agents and Defendants

12   arrived at the rendevous point and exited the vehicles, a prearranged signal was given and the

13   SWAT team closed in and arrested the Defendants.

14                                     **DISCUSSION**

15   **1.    Whether the Indictments Should Be Dismissed Based on Outrageous**
     **Government Conduct**
16

17          The potential for dismissal based on outrageous government conduct in violation of the

18   Due Process Clause of the Fifth Amendment was recognized by the Supreme Court in *United*

19   *States v Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1642-43 (1973) and *Hampton v. United*

20   *States*, 425 U.S. 484, 96 S.Ct. 1646 (1976).  Dismissal on this basis is limited to extreme cases in

21   which the government's conduct violates fundamental fairness and is shocking to the universal

22   sense of justice.  *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008), citing *United*

23   *States v. Holler*, 411 F.2d 1061, 1065 (9th Cir. 2005).   The Ninth Circuit has stated that law

24   enforcement conduct becomes constitutionally unacceptable where government agents engineer

25   and direct a criminal enterprise from start to finish or when government conduct constitutes, in

26   effect, the generation of new crimes merely for the sake of pressing criminal charges against the

27   defendant.  *United States v. Bogart*, 783 F.2d 1428, 1436 (9th Cir. 1986).  *Bogart* noted that in

28   each of the cases in which the outrageous conduct defense has succeeded, the government

                                              17

1    essentially manufactured the crime.  *Id.*

2         In determining whether particular government conduct is sufficiently outrageous that it

3    implicates due process concerns, the court must take special care not to permit the objective

4    analysis of this "defense" to swallow the subjective entrapment rule.  The government's

5    intolerable conduct must go beyond that necessary to sustain an entrapment defense, and the

6    court must exercise scrupulous restraint before it denounces law enforcement conduct as

7    constitutionally unacceptable.  The constitutional defense is reserved for only the most

8    intolerable government conduct.  *United States v. Bogart*, 783 F.2d at 1435.  The courts have

9    denied motions to dismiss in a variety of circumstances where the conduct of government agents

10   or informants fell short of manufacturing the charged crimes.  In *United States v. Smith*, 924 F.3d

11   889, 897 (9th Cir. 1991), for example, the court held that the government's conduct in

12   encouraging an 18 year old drug patient in a treatment center to deal drugs to the defendant, who

13   was also a patient, did not violate due process.  The court noted that there was evidence that

14   defendant was predisposed to deal in drugs.  *Smith* also cited the following examples of

15   government conduct that the courts have held does not warrant dismissal:

16            Use of false identities by undercover agents, *Shaw,* 796 F.2d at
             1125, and *United States v. Marcello,* 731 F.2d 1354, 1357 (9th
17           Cir.1984); the supply of contraband at issue in the offense,
             *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646,
18           1649-50, 48 L.Ed.2d 113 (1976); the commission of equally
             serious offenses by an undercover agent as part of the
19           investigation, *United States v. Stenberg,* 803 F.2d 422, 430 (9th
             Cir.1986); the introduction of drugs into a prison to identify a
20           distribution network, *United States v. Wiley,* 794 F.2d 514, 515
             (9th Cir.1986); the assistance and encouragement of escape
21           attempts, *United States v. Williams,* 791 F.2d 1383, 1386 (9th Cir.),
             *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986);
22           use of a heroin-using prostitute informant whose own activities
             were under investigation and who engaged in regular intercourse
23           with the defendant, *United States v. Simpson,* 813 F.2d 1462,
             1465-71 (9th Cir.1987).

24

25        A district court may also exercise its supervisory powers to dismiss an indictment in

26   response to outrageous government conduct that falls short of a due process violation.  To justify

27   the exercise of the court's supervisory powers, however, the government's misconduct must (1)

28   be flagrant and (2) cause substantial prejudice to the defendant.  *United States v. Fernandez*, 388

1   F.3d 1199, 1239 (9th Cir. 2004), citing *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004).

2   Where the motion concerns the government's out-of-court conduct, dismissal is not proper

3   absent a constitutional or statutory violation.  Dismissal on this ground also requires that no other

4   lesser remedial action be available.  *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir.

5   2008).

6         **A.**     **Robbery Conspiracy Charged in Case No. 2:08-cr-163-JCM-GWF**

7        In *United States v. Williams*, 547 F.3d 1187 (9th Cir. 2008), the court rejected a claim of

8   outrageous government conduct in regard to an undercover sting operation similar to the one

9   alleged in Case No. 2:08-cr-163-JCM-GWF.  The defendant in *Williams* initially engaged in

10  narcotics transactions with a government informant.  The defendant thereafter told the informant

11  about a bank robbery he was planning to commit and which he had already planned in some

12  detail.  The informant relayed this information to an ATF agent who proposed that the informant

13  pitch the idea of robbing a fictitious drug stash house to defendant in lieu of robbing a bank.  The

14  informant subsequently introduced defendant to an undercover ATF agent who posed as a person

15  who wanted to organize the drug stash house robbery.  During subsequent conversations, the

16  undercover agent and the defendant discussed more details about how to conduct the robbery

17  which included a plan to kill the persons guarding the drug stash house.  The defendant thereafter

18  assembled a crew of individuals who armed themselves with the weapons and other equipment to

19  be used in the robbery.  When the suspects met at the staging area to perform the robbery, they

20  were arrested.

21       In affirming the denial of the motion to dismiss, *Williams* cited the five factors set forth in

22  *United States v. Bonanno*, 852 F.2d 434, 437-438 (9th Cir. 1988) that, when satisfied, indicate

23  that the governmental conduct was acceptable:

24          (1)  the defendant was already involved in a continuing series of
            similar crimes, or the charged criminal enterprise was already in

25          progress at the time the government agent became involved; (2) the
            agent's participation was not necessary to enable the defendants to

26          continue the criminal activity; (3)  the agent used artifice and
            stratagem to ferret out criminal activity; (4) the agent infiltrated a

27          criminal organization; and (5) the agent approached persons
            already contemplating or engaged in criminal activity.

28

1    *Williams*, 547 F.3d at 1199-1200.

2           *Williams* held that all five factors were met under the facts of that case.  The agents

3    infiltrated an already existing criminal organization that had committed and was planning to

4    commit crimes similar to that suggested by the undercover agents.  The court stated that the

5    agents' conduct was best characterized as a "stratagem to ferret out criminal activity" that the

6    defendant was already contemplating and "[t]he government's decision to use a sting operation to

7    apprehend this group of criminals reduced the risk of violence to the public and is to be

8    commended, not condemned."  *Williams*, 547 F.3d at 1201.  In a footnote to this statement,

9    *Williams* further states:

> In connection with the outrageous government conduct claim, the
> appellants present two additional arguments. First, they argue that
> the government created a crime of violence, in violation of Justice
> Powell's concurrence in *Hampton v. United States,* 425 U.S. 484,
> 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Justice Powell stated:
> "There is certainly a constitutional limit to allowing governmental
> involvement in crime. It would be unthinkable, for example, to
> permit government agents to instigate robberies and beatings
> merely to gather evidence to convict other members of a gang of
> hoodlums." *Hampton,* 425 U.S. at 493 n. 4 (Powell, J., concurring
> in the judgment) (quoting *United States v. Archer,* 486 F.2d 670,
> 676-77 (2d Cir.1973)). The government correctly notes that Justice
> Powell was referring "to government conduct that would encourage
> and condone direct and deliberate harm to others," such as if the
> government prosecuted a defendant for robbery after encouraging
> the defendant to rob a victim. Justice Powell's concurrence
> explicitly approves the use of sting operations to combat drug
> offenses. *See Hampton,* 425 U.S. at 493 (Powell, J., concurring).
> Here, the sting operation not only involved drugs, it was also
> designed to catch Williams, a known bank robber and drug dealer,
> in a *conspiracy* to perform the types of acts that he already
> indicated his willingness to perform and had begun planning. The
> government did not instigate a robbery or beating "merely to gather
> evidence to convict other members of a gang of hoodlums." *Id.* at
> 493 n. 4. They devised a plan to catch a potentially dangerous
> group of robbers in a controlled sting operation.
>
> Second, the appellants argue that the government directed the
> criminal scheme from start to finish. This argument lacks merit
> because Williams was intimately involved in the development of
> the plan. Williams hatched the bank robbery scheme entirely on his
> own, and he participated in the planning stages of the stash house
> robbery. He arranged for his crew to help him, including
> instructing Hollingsworth to bring a gun and a police scanner to the
> motel. He sold weapons to raise money to rent the car for the
> robbery, and he repeatedly indicated his willingness to do the job.
> Government agents may have "provide[d] valuable and necessary

1    items to the venture," *Gurolla,* 333 F.3d at 950, but that is
2    insufficient to demonstrate that the government directed the
     enterprise from start to finish. *Id.*

3    *Williams*, 547 F.3d 1201, footnote 11.

4           In *United States v. Sanchez*, 138 F.3d 1410 (11th Cir. 1998), the Eleventh Circuit also

5    affirmed the denial of a motion to dismiss based on outrageous government conduct in regard to

6    a "reverse sting" operation similar to the one at issue in this case.  According to the court's brief

7    statement of facts, the ATF received information from a confidential informant about a group of

8    armed home invaders who would "rip-off" narcotics from stash houses.  Through the informant,

9    the government created a reverse sting operation by which the defendants agreed to all of the

10   details of a home invasion.  Defendants thereafter were arrested in a parking lot where they had

11   assembled in readiness to commit the robbery.  In holding that the government did not engage in

12   outrageous conduct, the *Sanchez* court stated:

13           The evidence reveals that ATF agents contacted individuals
             suspected of being involved in home invasions.  Informed by these
14           individuals that large amounts of narcotics could be stolen in a
             home invasion, defendants voluntarily agreed to participate.  The
15           defendants were involved without any instigation from the
             government.  They only had contact with the government agent
16           after they had already agreed to participate.  The availability of
             defendants, their weapons and vehicles was not the result of any
17           governmental activity.  The conduct of the government here does
             not approach that demonstrable level of outrageousness the case
18           law suggests would be necessary for reversal of these defendants'
             convictions.

19

20   *Sanchez*, 138 F.3d at 1413-1414.

21          The reasonableness of the ATF's decision to pitch the robberies to Defendants Flores and

22   Sangalang is not as readily defensible as its conduct in *Williams* or *Sanchez*.  The ATF did not

23   have information that Defendants Flores or Sangalang were actually planning an armed robbery

24   or a similar violent crime.  Nor did the ATF have information that Flores and Sangalang had

25   performed home invasion/stash house robberies in the past.  The ATF, however, had a reasonable

26   basis to believe that Defendants Flores and Sangalang would be receptive to the proposed

27   robberies based on their previous statements and conduct.

28   . . .

21

1    Agent Gomez testified that the robbery pitch was made to Flores and Sangalang because

2    of their previous bragging regarding their violent gang affiliations.  Defendant Flores also told

3    the agents that he had a crew of individuals who were willing to commit robberies.  Defendant

4    Sangalang had also told the undercover agents about his violent gang association or membership

5    and he had sold illegal firearms and drugs to the agents.  According to Agent Gomez, Mr.

6    Sangalang also became upset when he observed the agents dealing with Donte Reed and wanted

7    to know why the agents were dealing with "those guys."  After Agent Gomez told Sangalang

8    about the robbery plan proposed to Mr. Reed, Defendant Sangalang stated:  "Well, if they can't

9    get a crew together, I can get a crew together."  *01/06/09 Hearing Transcript, Docket No. 234*,

10   page 206.  Thus, Defendant Sangalang expressed his desire to be involved in the agents' robbery

11   plans even before the details of the robbery were presented to him.

12   Defendants Flores' and Sangalang's responses to the pitches also justified the undercover

13   agents' decision to continue to pursue the reverse sting.  According to Agents Gomez and

14   McCarthy, neither Mr. Flores nor Mr. Sangalang expressed reluctance about committing the

15   robberies and murders.  The recordings appear to confirm this.  Once the pitches were made, both

16   Defendants expressed their interest and willingness to commit the robbery, although Mr.

17   Sangalang, in particular, discussed with the agents the difficulties that could be encountered.

18   This included the danger that the robbers' identities would be discovered by the narcotics

19   traffickers whose drugs and money would be stolen and whether Mr. Sangalang's potential crew

20   members would agree to participate without some advance payment.  Within two days after the

21   pitch, however, Defendant Sangalang told Agent Gomez that he had started recruiting crew

22   members and had chosen individuals for specific roles.

23   The undercover agents, in particular Agent Bayless, provided Flores and Sangalang with

24   the details about the proposed robberies, including the robbery locations, how much narcotics or

25   cash were likely to be taken, and the number of persons in each house.  If Agent Bayless did not

26   actually tell Flores and Sangalang that they should kill the stash house guards, he suggested it by

27   telling them that the guards were "strapped" and were "hitters" and would likely resist.  The

28   agents also suggested that it would probably be necessary to kill the inside guy.  Although the

1   undercover agents provided and exercised control over key information as to when and where the

2   robberies would take place, they left it to Defendant Sangalang and Flores to form the robbery

3   crews.  Mr. Sangalang or Mr. Flores recruited the other defendants to join the robbery conspiracy

4   and selected which individuals would be in the respective crews.  Some of those crew members

5   told the agents that they had previously committed armed robberies.  During the meetings with

6   the agents, the Defendants discussed the methods or means they would use to commit the

7   robberies. This included impersonating police officers and how and where to kill the persons in

8   stash house and the "inside guy."  Defendants supplied their own firearms and other equipment,

9   including zip-ties, ski masks and a police radio scanner.  On the day of the robbery, the

10  Defendants followed the undercover agents to the rendevous location in their own vehicles.  As

11  *Williams* states, these types of actions substantially detract from a finding that the government

12  orchestrated or directed the enterprise from start to finish.

13          The Court therefore finds that the ATF agents' conduct in regard to the fictitious stash

14  house robberies was not so outrageous as to require dismissal under the Due Process Clause of

15  the Fifth Amendment or pursuant to the Court's supervisory powers.

16          **B.      Firearms and Narcotics Crimes Charged in Case Nos. 2:08-cr-140-KJD-GWF and 2:08-cr-141-KJD-GWF**

17

18          Defendants argue that the indictments in Case Nos. 2:08-cr-140-KJD-GWF and 2:08-cr-

19  141-KJD-GWF relating to illegal firearm and narcotics sales, should be dismissed because the

20  undercover agents or the informant Richard Beckworth made threats against the defendants.

21          Defendant Deandre Patton was the only Defendant to testify during the hearing.  *05/11/09*

22  *Hearing Transcript, Docket No. 344*, pages 6-52; 95-140.  He testified that he believed Agents

23  McCarthy and Gomez were bikers and Hells Angels.  Mr. Patton stated that on one occasion

24  Agent McCarthy made a statement "basically stating that the people that he worked with, they

25  don't f*** around, and if we didn't get our stuff together that everybody could die, everybody

26  would die, our families, everybody."  *Id.*, page 19.  Defendant Patton also testified that Agent

27  Gomez told the Defendants that he was vouching for them to Agent McCarthy, that they had to

28  make themselves look good to McCarthy and that if they didn't, it would fall back on him.  *Id.*,

23

page 18-19.  Defendant Patton also testified that Mr. Beckworth showed him and Defendants Sangalang and Flores a video of a fight in which Mr. Beckworth beat up another individual.  *Id.*, page 11.  Mr. Patton stated that he was not frightened or concerned about his safety from watching the video.  He stated, however, that he felt concerned about Mr. Beckworth at certain times because he "wasn't acting like a regular person" and appeared to be a "hothead."  He was not, however, in physical fear of Mr. Beckworth.  *Id.*, pages 41-42.

While Defendant Patton's testimony may be relevant to an entrapment defense at trial, it clearly does not warrant dismissal of the indictments.  The  undercover agents portrayed themselves as the operators of a criminal enterprise who were involved in the purchase of illegal firearms and narcotics.  Agent McCarthy's and Agent Gomez's alleged statements about what might happen if the Defendants did not fulfill their obligations was consistent with their role-playing.  The alleged statements did not involve specific threats to Mr. Patton or any other Defendant.  There is no evidence that the ATF agents were aware of any threats made to the Defendants by Mr. Beckworth.  Nor does Defendant Patton's testimony indicate that either he or the other Defendants were actually fearful of Mr. Beckworth.  The video evidence introduced during the hearing shows Defendants Sangalang, Flores and Patton behaving in a casual, cooperative, friendly, and sometimes joking manner with the undercover agents while engaging in firearms or narcotics deals or discussing and planning the robberies.  The totality of the evidence presented during the hearing therefore does not support the conclusion that Defendants were coerced into committing any of the charged crimes because they feared the undercover agents or the informant Beckworth.

**2.**	**Defendants' Argument that the Indictments Should be Dismissed Because Agent McCarthy Allegedly Used Illegal Drugs During the Undercover Operation**

Defendants argue that the indictments should be dismissed because Agent McCarthy used illegal drugs during the undercover operation.  Defendants have also suggested that the agents' frequent beer drinking or the fact that agents provided beer to the targets of the investigation, some of whom were minors, warrants dismissal of the indictment.  Even if the Court were to find that these allegations are true, they do not support dismissal of the indictments.

24

The cases cited by Defendant do not support dismissal of the indictment based Agent McCarthy's alleged drug use.  In *United States v. Ramirez*, 710 F.2d 535, 540-41 (9th Cir. 1983), the government prosecuted the defendant for his participation in a narcotics conspiracy which defendant claimed he was authorized to engage in as an informant.  The government argued, however, that defendant violated his informant's agreement and that the crime he was charged with was not part of his agreement.  Although the court found some validity to defendant's contentions, it held that the government's conduct did not rise to the level justifying dismissal under the due process clause or the court's supervisory powers.  In *United States v. Simpson*, 927 F.2d 1088 (9th Cir. 1991), the government used a drug-using prostitute as an informant.  While engaging in narcotics transactions with the defendant, the informant also engaged in repeated sexual intercourse with him.  The court held that this conduct did not warrant dismissal pursuant to the court's supervisory powers. (The court had previously reversed dismissal of the indictment based on the due process clause.  *See United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987)). In *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991), the court held that an indictment should not have been dismissed because the informant used narcotics obtained from the defendants and because the government failed to properly test him for drug use.

Although *Ramirez*, *Simpson* and *Barrera-Moreno* held that there were insufficient grounds to dismiss the indictments, there was at least some evidence in those cases of a causal relationship between the government's conduct and the defendants' criminal behavior.  The Court is not aware of any case which holds that an indictment should be dismissed because a government agent engages in illegal drug use during an undercover operation, especially where no showing is made that the agent's misconduct affected the defendants' behavior in committing the charged offenses.  There is simply no evidence in this case that Agent McCarthy's alleged illegal drug use played any role in the alleged firearms or narcotics transactions or the robbery conspiracy.  Thus, even if it was proven that Agent McCarthy used illegal drugs, dismissal of the indictments would not be justified on this ground.

Defendants have also not met their burden of proving that Agent McCarthy did, in fact, use illegal drugs.  During the hearing, Defendants played excerpts of video recordings produced

25

by the Government. *See 10/2/08 Hearing Transcript , Docket No. 190*, pages 36-49.  In one excerpt, Agent McCarthy removes a glass pipe from the desk drawer.  Agent McCarthy has a cell phone conversation in which he asks whether someone is on their way in.  He looks out the rear office window and then lights the pipe.  Agent McCarthy blows several puffs out into the office and puts the pipe in the desk drawer.  Agent Gomez then enters the office.  Agent McCarthy again removes the pipe from the drawer and takes a couple of puffs.  The Court cannot determine what, if any, reaction Agent Gomez has to Agent McCarthy's use of the pipe.  A few minutes later, a male subject and a female enter the office.  The audio is of very poor quality and the Court cannot determine what is discussed.  *Defendants' Exhibit "F".*

Defendants claim that another excerpt, *Exhibit "G"*, shows Agent McCarthy telling the informant Pedrasa not to smoke pot in the tattoo parlor and that he doesn't want the smell of weed in the shop.  Defendants argue that this statement is inconsistent with Agent McCarthy's testimony that he smoked Wizard Weed so that the targets would smell the marijuana odor and think he was using the drug. *10/2/08 Hearing Transcript , Docket No. 190*, page 41.  Having listened to the recording, however, the Court cannot make out any such statement by Agent McCarthy.  Agents McCarthy and Gomez testified that the gang members who hung out in the tattoo parlor regularly smoked marijuana on the premises.  While it is possible that Agent McCarthy told Mr. Pedrasa not to smoke marijuana in the tattoo parlor, it seems unlikely that Agent McCarthy would have told him that he did not want the smell of marijuana in the tattoo parlor.

A third excerpt shows Agent McCarthy light the pipe and walk out of the office. *Exhibit "H,"* at 1:38.  Defendants also claim that *Exhibit "H,"* at 1:45, shows Agent McCarthy rolling a dollar bill which he uses to snort a substance.  The video shows Agent McCarthy remove a bill from his pocket which he rolls and unrolls at least twice and then places to his nose and sniffs.  There is no indication, however, that Agent McCarthy placed any substance on the desk which he sniffed through the rolled bill.  As the video continues, he appears to pour a powdery substance into the desk drawer, but then exits the room.

. . .

1    Agent McCarthy testified that Agent Gomez provided him with a small quantity of

2  Wizard Weed which he used in the early part of the undercover operation to make it appear to the

3  targets that he used illegal drugs.  Agent McCarthy testified that Wizard Weed is a commercially

4  available herb that is sold over the Internet and through various magazines.  It does not contain

5  THC.  *12/19/08 Hearing Transcript, Docket No. 224*, pages 107-109.  Agent McCarthy also

6  testified that he had a target, whom he characterized as an "unwitting informant," purchase a

7  glass smoking pipe from a local head shop which he used to smoke the Wizard Weed.  *1/05/09*

8  *Hearing Transcript, Docket No.,* pages 10-11.  The purchase of this pipe was documented in an

9  expenditure voucher.  *Id.*   Agent McCarthy also testified that on one occasion he practiced

10  simulating the snorting of a fake controlled substance by rolling a dollar bill.  He indicated that

11  his plan was to perform this simulation as one of the targets walked into the tattoo parlor office.

12  He stated, however, that he never carried out this ruse.  *Id.*, pages 115, 224-225, 244.  He also

13  testified that he had a non-prescription headache powder which he would have used to simulate

14  cocaine.  *Id.*

15    Agent Gomez testified that he obtained the Wizard Weed during a training seminar on

16  undercover techniques presented by retired ATF Agent Charles Fuller.  *1/26/09 Hearing*

17  *Transcript Docket No. 249*, page 56.  Mr. Fuller testified that he discusses the use of Wizard

18  Weed as an undercover prop during his seminars.  According to Mr. Fuller, Wizard Weed

19  simulates the appearance and smell of marijuana.  He also sells quantities of Wizard Weed to law

20  enforcement officers who attend the seminars and gives free samples to ATF agents who attend.

21  Mr. Fuller testified that he gave Agent Gomez a small quantity of Wizard Weed during a seminar

22  in Las Vegas in October 2006.  *12/19/08 Hearing Transcript, Docket No. 224*, pages 8-12.  He

23  testified that Wizard Weed has been tested by the Honolulu Police Department which confirmed

24  that it does not contain THC.  *Id.*, pages 40-41.

25    Defendants challenge the credibility of the agents' and Mr. Fuller's testimony.  They note

26  that the agents did not obtain express approval from ATF management to use Wizard Weed in

27  the investigation.  Nor was there any contemporaneous documentation that Agent Gomez

28  obtained the Wizard Weed from Mr. Fuller.  There was no mention in the contemporaneous

1   investigation reports that Agent McCarthy was using Wizard Weed to simulate drug use.  Agent

2   McCarthy testified that his use of Wizard Weed was "documented" because other ATF agents

3   could have observed it on the live video feed from the surveillance camera and because his use of

4   Wizard Weed is on recordings which were provided to the Defendants.  Defendants suggest,

5   however, that these recordings were inadvertently preserved by the agents and turned over the

6   prosecutors who, in turn, were unaware of the recordings' contents before they were produced to

7   Defendants.

8        Defendants also presented the testimony of Jennifer Chao regarding alleged drug use by

9   Agent McCarthy.  *May 11, 2009 Hearing Transcript Vol. II, Docket No.* 345, pages 28- 32.  Ms.

10  Chao's boyfriend David Murphy is a defendant in another case arising out of the undercover

11  operation.  Ms. Chao attended the hearing in this case and observed the testimony of Agent

12  McCarthy.  According to Ms. Chao, she approached Defendants' counsel after the hearing and

13  advised them that she had information regarding Agent McCarthy's drug use.  Ms. Chao testified

14  that she went to Hustler Tattoo with Mr. Murphy in April 2008 to talk to Richard Beckworth

15  about a tattoo.  Ms. Chao stated that she walked into Hustler's Tattoo with a marijuana "blunt,"

16  i.e., a cigar sized marijuana cigarette.  She testified that after looking at tattoo artwork, she, Mr.

17  Murphy and Mr. Beckworth went outside and smoked the marijuana.  After Murphy and

18  Beckworth went back inside the tattoo parlor, Agent McCarthy came out, observed her smoking

19  the marijuana and commented on its smell.  Ms. Chao asked him if he wanted a hit.  Agent

20  McCarthy said sure and took two "hits" on the blunt. The Government did not recall Agent

21  McCarthy to rebut Ms. Chao's testimony.  It presumably relies on Agent McCarthy's denial that

22  he used illegal drugs during the undercover operation.  While it is possible that Ms. Chao

23  testified truthfully, she has a motive to testify falsely to support her boyfriend's defense.

24       The Court finds that Agent McCarthy's testimony that he used Wizard Weed to simulate

25  drug use as part of his role playing in the undercover operation is credible and believable.  His

26  testimony is also supported by Agent Gomez and Mr. Fuller.  Clearly, the undercover agents and

27  their supervisors could and should have done a better job in documenting Agent McCarthy's use

28  of Wizard Weed or other simulated drug use, if for no other reason than to preserve his

credibility as a trial witness.  The evidence is insufficient, however, to justify the conclusion that

Agent McCarthy used illegal drugs during the undercover operation.

**3.**    **Government's Alleged Failure to Preserve Potentially Exculpatory Audio/Video Evidence**

Defendants also contend that the indictments should be dismissed because the ATF

agents failed to preserve thousands of hours of video/audio recordings made at Hustler's Tattoo

during the undercover operation, some of which allegedly contained evidence favorable to the

Defendants.  They also argue that the incidents may have been observed by the task force agents

who were monitoring the live video feed and therefore the ATF was on some notice of its duty to

preserve the recordings of those events.

The ATF equipped the interior of Hustler's Tattoo with three concealed video cameras.

One of these cameras was located in the office where the narcotics and firearms transactions took

place and where the meetings regarding the robbery conspiracy occurred.  The other cameras

were located in the "public area" of the tattoo parlor and provided coverage of the tattoo bays

where Defendant Sangalang and the informant Beckworth worked as tattoo artists.  Concealed

microphones were also located in the office and other areas of the tattoo parlor. There were also

cameras located on the exterior of the tattoo parlor.  These cameras were monitored by other

agents at a nearby location for purposes or protecting the agents when they were present at the

tattoo parlor.  The cameras and microphones were connected to a computer which allowed ATF

agents and supervisors at remote locations to observe the activities inside the tattoo parlor on

their personal computers.  The recordings on the hard drive, however, were not preserved.

The ATF installed a cabinet in the rear of the tattoo parlor which contained three DVD

recorders which were connected to the interior cameras and microphones.  Only one microphone

could be recorded at any given time, however, and the agents had to turn a switch inside the

cabinet to select which microphone to record.  The agents loaded DVD discs into the recorders

each day prior to when they planned to be in the parlor.  Because the cabinet was located in an

area of the shop that was accessible to the targets, including Mr. Sangalang, the agents would

have to load and remove DVDs when no one else was present or do so in a surreptitious manner.

1   The outside cameras were not connected to the DVD players.

2        After the agents conducted firearm or narcotics transactions or meetings about the

3   proposed stash house robberies, they would mark the DVDs on which the events were recorded

4   for identification and place the DVDs in the ATF's evidence vault.  Those DVDs would also be

5   identified in the agents' reports of investigation.  Agent Gomez testified that the agents preserved

6   DVDs which contained information of "evidentiary value," i.e, illegal firearms and narcotics

7   deals, and the meetings concerning the robbery conspiracy.  He testified that the agents would

8   have preserved any DVDs that recorded matters favorable to the suspects or targets, but to his

9   knowledge there were none.  He also testified that the agents did not attempt to review the hours

10   of recordings when no Government agents were present to determine if they contained something

11   of evidentiary value or information or evidence favorable to the suspects.  Unless a DVD

12   contained something that the agents knew had evidentiary value, it was discarded.

13        Agents Gomez and McCarthy did not discuss the decision to discard the DVDs with their

14   ATF supervising agents or with the Assistant United States Attorney assigned to the

15   investigation.  A 1989 ATF procedure order or manual states that all "electronic interception

16   evidence," which is defined as original tapes, logs, and transcripts, whether consensual or

17   nonconsensual, is be preserved, regardless of its perceived evidentiary value, until the case is

18   disposed of or the case is closed.  *Defendants' Exhibit "EE."*  ATF Supervising Agent Donald

19   York testified, however, that this procedure order is outdated, and the ATF does not require

20   agents to preserve electronic surveillance of the type involved in this case unless it has known

21   evidentiary or exculpatory value.  *8/7/09 Hearing Transcript, Docket No. 373*, pages 125-26.

22        Defendant Patton testified that in December 2007, Richard Beckworth sawed off the

23   barrels and removed the serial numbers from some rifles at Defendant Sangalang's house.  Mr.

24   Beckworth then asked Defendant Sangalang to take the sawed-off rifles to the tattoo parlor.  Mr.

25   Patton drove Defendant Sangalang to the tattoo parlor where Sangalang sold the weapons to the

26   undercover agents in the tattoo parlor office.  Mr. Beckworth went to the tattoo parlor in his own

27   vehicle.  After Mr. Sangalang sold the sawed-off rifles to the undercover agents, he and Patton

28   went back into the tattoo parlor where Mr. Sangalang gave the proceeds of the sale to Mr.

1    Beckworth.  *5/11/09 Hearing Transcript, Docket No. 244*, pages 7-9.  (Mr. Patton did not testify

2    whether Mr. Beckworth supplied the firearms in other transactions that he or Defendants

3    Sangalang engaged in with the agents.)  Mr. Patton testified that on other occasions, Mr.

4    Beckworth showed the Defendants firearms and different types of marijuana that he had inside

5    the tattoo parlor.  *Id.*, page 10.

6           Defendants presented the testimony of Ashley Gonzalez to corroborate Mr. Patton's

7    testimony that Mr. Beckworth supplied the sawed-off rifle(s).  Ms. Gonzalez testified that she

8    was introduced to Mr. Beckworth by her brother-in-law Paul Ashley who is a defendant in

9    another case arising out of the undercover operation.  Ms. Gonzalez testified that in December of

10   2007, Mr. Beckworth asked her to go with him to a Big 5 sporting goods store to purchase a gun.

11   Mr. Beckworth gave Ms. Gonzalez the money to purchase the firearm which she then purchased

12   in her own name.  She acknowledged that she signed a purchase form in which she represented

13   that she was purchasing the gun for herself.   She then returned to Paul Ashley's house with Mr.

14   Beckworth who took possession of the gun.  Mr. Beckworth told her that he intended to sell the

15   gun.  *5/11/09 Hearing Transcript, Docket No. 244*, pages 18-23.

16          Defendant Patton also testified that the methamphetamine that he and Defendant

17   Sangalang sold to the agents was actually supplied by Mr. Beckworth.  According to Mr. Patton,

18   Mr. Beckworth asked Sangalang and Patton to sell the drugs to the agents for him because they

19   would be able to get a better price than he could.  *Id.*, pages 13-14.  Mr. Patton also testified that

20   it was his understanding that the agents would tell Mr. Beckworth what amount of

21   methamphetamine they were seeking.  Mr. Beckworth would then obtain the drug and provide it

22   to Defendants to deliver to the agents.  *Id.*  Mr. Patton testified that after Sangalang sold the

23   drugs to Agents McCarthy and Gomez, the agents would leave the tattoo parlor.  Mr. Beckworth

24   would then arrive at the parlor and Mr. Sangalang would pay Mr. Beckworth the money that was

25   given to him by the agents.  *Id.*, page 15.

26          Defendants argue that the money exchanges with Mr. Beckworth in the tattoo parlor were

27   recorded on the discarded DVDs.  They also claim that the discarded DVDs would have verified

28   Mr. Beckworth's frequent use of marijuana in the tattoo parlor and Jennifer Chao's presence in

31

1  the tattoo parlor on the date that Agent McCarthy allegedly smoked from her marijuana blunt.

2  They also suggest that the discarded videos may have shown additional occasions in which Agent

3  McCarthy used illegal drugs.  Because the Government did not preserve the videos, Defendants

4  argue the indictments should be dismissed.

5  In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the

6  Supreme Court stated that the due process clause requires that criminal defendants be afforded a

7  meaningful opportunity to present a complete defense, and that to safeguard that right, the Court

8  had developed "what might loosely be called the area of constitutionally guaranteed access to

9  evidence."  *Trombetta*, 104 S.Ct. at 2532, quoting *United States v. Valenzuela-Bernal*, 458 U.S.

10  858, 867, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982).  As part of this requirement, the Court

11  held that the government has some duty to preserve evidence favorable to the accused.  The

12  Court stated:

13  Whenever potentially exculpatory evidence is permanently lost,
     courts face the treacherous task of divining the import of materials

14  whose contents are unknown and, very often, disputed.  (citation
     omitted).  Moreover fashioning remedies for the illegal destruction

15  of evidence can pose troubling choices.  In nondisclosure cases, a
     court can grant the defendant a new trial at which the previously

16  suppressed evidence may be introduced.  But where evidence has
     been destroyed in violation of the Constitution, the court must

17  choose between barring further prosecution or suppressing – as the
     California Court of Appeals did in this case – the state's most

18  probative evidence.

19  *Trombetta*, 104 S.Ct. at 2533.

20  In reversing the state court's order suppressing "Intoxilyzer" test results because the state

21  failed to preserve the breath samples, the Court noted that the California authorities did not

22  destroy the samples in a calculated effort to circumvent the disclosure requirements established

23  by *Brady v. Maryland* and its progeny.  The court also accepted that the officers were acting in

24  good faith and in accord with their normal practice and there was no record or allegation of

25  official animus toward the defendants or a conscious effort to suppress exculpatory evidence.

26  The Court further stated:

27  More importantly, California's policy of not preserving breath
     samples is without constitutional defect.  Whatever duty the

28  Constitution imposes on the States to preserve evidence, that duty

32

1  must be limited to evidence which might be expected to play a
2  significant role in the suspect's defense.  To meet this standard of
   constitutional materiality, see *United States v. Agurs*, 427 U.S., at
3  109-110, 96 S.Ct., at 2400, evidence must both possess an
   exculpatory value that was apparent before the evidence was
4  destroyed, and be of such a nature that the defendant would be
   unable to obtain comparable evidence by other reasonably
5  available means.  Neither of these conditions is met on the facts of
   this case.

6  *Id.,* 104 S.Ct. at 2534.

7      In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the

8  defendant was convicted of child molestation, sexual assault and kidnaping.  The defendant's

9  conviction was based in part on the victim's eyewitness identification of him.  The state failed to

10 properly refrigerate the semen and blood samples found on the victim's clothing and the tests

11 performed on the samples after they had deteriorated were inconclusive.  Defendant's expert

12 declined to conduct tests on the deteriorated samples.  The Arizona Court of Appeals reversed

13 the defendant's conviction on the grounds that timely tests on properly preserved samples might

14 have exonerated the defendant.  In reversing and reinstating defendant's conviction, the Supreme

15 Court held that in addition to the two requirements of *Trombetta*, the defendant was also required

16 to show that the state's failure to preserve the evidence was done in bad faith.  *Id.*, 109 S.Ct. at

17 337.  The Court stated that the state's failure to refrigerate the samples was negligent at worst.

18     In *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993), the court affirmed the

19 dismissal of the indictment based on the government's failure to preserve potentially exculpatory

20 evidence.  In that case, the government alleged that defendants used a reaction vessel to

21 manufacture methamphetamine.  The defendants' attorney informed the government that the

22 vessel was used to manufacture a legal substance and that the physical configuration of the vessel

23 was not suitable for making methamphetamine.  Despite being on notice of defendants' claim

24 and request that the vessel be made available for their expert's inspection, the government

25 allowed the vessel to be buried in a landfill.  Pursuant to *Trombetta*  and *Youngblood,* the Ninth

26 Circuit held that to establish a constitutional due process violation based on the failure to

27 preserve evidence, the defendant must show (1) that the unavailable evidence possessed

28 exculpatory value that was apparent before the evidence was destroyed; (2) that defendant was

33

1    unable to obtain comparable evidence by other reasonably available means; and (3) that the

2    government acted in bad faith in failing to preserve the evidence.  *Cooper* noted that "[t]he

3    presence or absence of bad faith turns on the government's knowledge of the apparent

4    exculpatory value of the evidence at the time it was lost or destroyed." *Id.*, 983 F.2d at 931,

5    citing *Youngblood*, 488 U.S. at 56-57 n. *, 109 S.Ct. at 336-337 n.*.

6         *Cooper* held that defendants satisfied all three elements to support dismissal.  First, the

7    government was on notice of the potential exculpatory value of the vessel before it was

8    destroyed.  Second, there was no available evidence, comparable to testimony by defendant's

9    expert after inspection, that the vessel was not suitable for making methamphetamine.  Finally,

10   the court held that the evidence supported a finding of bad faith because the government made no

11   effort to preserve the vessel after being notified of its potential exculpatory value.  The

12   government also misrepresented to defendants that the equipment was being held as evidence

13   even after it knew that it had probably been discarded.  *Compare United States v. Curtin*, 443

14   F.3d 1084, 1094 (9th Cir. 2006) (the government's alleged failure to preserve a surveillance video

15   recording of defendant approaching an alleged victim did not require dismissal because

16   defendant failed to show how the video would have been exculpatory).

17        The ATF agents' conduct in discarding DVDs made during the undercover investigation

18   can be fairly criticized.  The agents were aware that the Defendants were present in the tattoo

19   parlor when the agents were not there.  They were also aware that the Defendants had contact

20   with Mr. Beckworth, as well as other targets of the investigation, inside the tattoo parlor that the

21   agents did not observe.  It would not have required any great foresight for the agents to have

22   recognized that the DVDs might contain relevant evidence that they were unaware of, including

23   evidence that Defendants would later claim was favorable to their defense.  There was also no

24   apparent need to discard or destroy the DVDs.  There is no evidence, for example, that the ATF

25   lacked the capacity to store all of the DVDs until the case was concluded.  The agents' decision

26   to discard or destroy the DVDs is also inconsistent with the 1989 ATF procedure order which

27   states that surveillance evidence should be retained until the case is disposed of or closed.

28   *Defendants' Exhibit "EE."*  Although Agent York testified that the ATF no longer follows that

1    order, he provided no clear explanation as why it is no longer followed.

2          Under *Trombetta* and *Youngblood*, however, the government's obligation to  preserve

3    evidence is limited to evidence whose exculpatory value was apparent to the government before

4    it was destroyed.  There is no evidence that Agents McCarthy, Gomez or the other agents

5    involved in the investigation, were aware that Defendant Sangalang delivered the firearm or drug

6    sales proceeds to Mr. Beckworth inside the tattoo parlor.  (Defendants have argued, however, that

7    these transactions could have been observed by other agents who were monitoring the live video

8    feed.)  Accordingly, Defendants have not met the first requirement of the *Trombetta*.  Because

9    bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence

10   at the time it was lost or destroyed, *Cooper*, 983 F.2d at 931, Defendants also cannot satisfy the

11   bad faith requirement of the test.

12         The Court is also not persuaded that the alleged transactions between Defendants

13   Sangalang and Patton and Mr. Beckworth are significantly favorable to the defense such that

14   dismissal of the indictments would be appropriate if the other elements of the *Trombetta* test

15   were met.  Agent Gomez testified that the firearms transactions with Defendants Sangalang and

16   Patton were arranged by Mr. Beckworth.  Presumably, Mr. Beckworth received some share of the

17   firearms sales proceeds from Defendants based on his role in setting up the transactions.

18   Assuming that the agents had observed Mr. Sangalang make a payment to Mr. Beckworth in the

19   tattoo parlor following the firearms transaction, this would not necessarily have indicated to the

20   agents that Mr. Beckworth actually supplied the guns.  Neither agent was questioned about this

21   during the hearing.  Defendants also elected not to call Mr.  Beckworth as a witness to question

22   him about his involvement in the firearms or narcotics transactions.  It is possible that Mr.

23   Beckworth will confirm that he received some payment from Defendants.  Therefore, Defendants

24   have also not shown that they are unable to obtain comparable evidence by other reasonably

25   available means.

26         The Defendants have a slightly better argument concerning the alleged payments to Mr.

27   Beckworth following the narcotics transactions.  Agent Gomez testified that to his knowledge

28   Mr. Beckworth was not involved in the narcotics transactions between Defendants Sangalang and

Patton and the agents.  Evidence that Mr. Beckworth received payments from Mr. Sangalang shortly after the drug sales occurred, would indicate that Mr. Beckworth was involved the narcotics transactions -- contrary to what Agent Gomez believes.  Defendant Patton also testified, however, that he and Sangalang voluntarily sold the drugs to the agents so that Mr. Beckworth could get a better price from them.[4]  The exculpatory value of the alleged evidence is therefore questionable.  Defendants' weak entrapment theory based on Mr. Beckworth having allegedly supplied the methamphetamine does not justify dismissal of the indictments.  In any event, there is no evidence that the agents were aware of the payments prior to discarding the videos.

Finally, Agents McCarthy and Gomez both testified that Mr. Beckworth smoked marijuana in the tattoo parlor on several occasions in violation of his informant's agreement.  The possibility that video recordings would have confirmed this or have shown additional instances in which Mr. Beckworth smoked marijuana does not warrant dismissal based the agents' failure to preserve the video recordings.  There is also no evidence that the Government disputes that witness Jennifer Chao was in the tattoo parlor in or about April 2008 as she claimed.  The possibility that video recordings would have confirmed her presence inside the tattoo parlor does not constitute proof that Agent McCarthy smoked marijuana on that occasion as she testified.

## CONCLUSION

Based on the foregoing, the Court concludes that Defendants have failed to meet their burden to support dismissal of the indictments based on outrageous government conduct under the due process clause or pursuant to the Court's supervisory powers.  Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Dismiss for Outrageous Government Conduct (#104) be **denied.**

. . .

---

[4]Agent Gomez testified that Sangalang and Patton made repeated attempts to get the agents to purchase narcotics from them and that Defendant Sangalang told the agents that he had sources of narcotics supply in Hawaii and Georgia.

1

**NOTICE**

2    Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must

3 be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has

4 held that the courts of appeal may determine that an appeal has been waived due to the failure to

5 file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit

6 has also held that (1) failure to file objections within the specified time and (2) failure to properly

7 address and brief the objectionable issues waives the right to appeal the District Court's order

8 and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153,

9 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

10    DATED this 28th day of October, 2009.

11

12                 GEORGE FOLEY, JR.

13                 United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28