UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER SANGALANG, ALFREDO FLORES, DEANDRE PATTON, ROD JONES, ROBERT WILLIAMS, DEREK JONES,<br><br>Defendants. | 2:08-CR-163 JCM (GWF) |

**ORDER**

Presently before the court is United States Magistrate Judge George Foley's report and recommendations (Doc. #399), filed on October 29, 2009, on defendants Christopher Sangalang's and Patton's motion to dismiss based on outrageous government conduct (Doc. #104).

The court conducted hearings on: October 2, 2008; November 20, 2008; December 19, 2008; December 30, 2008; January 5, 2009; January 6, 2009; January 27, 2009; February 20, 2009; March 26, 2009; April 30, 2009; May 6, 2009; May 11, 2009; May 12, 2009; June 24, 2009; and August 7, 2009. Magistrate Judge Foley recommended that defendants' motion to dismiss for outrageous government conduct (Doc. #104) be denied.

**BACKGROUND**

This motion involves several related indictments. In Case No. 2:08-cr-140-KJD-GWF, defendants Christopher Sangalang and Deandre Patton were charged with conspiracy to distribute methamphetamine, distribution of controlled substances, and aiding and abetting with the unlawful

**James C. Mahan**
**U.S. District Judge**

possession of a short-barreled shotgun, short-barrel rifles, and firearms with obliterated serial numbers. In Case No. 2:08-cr-141-KJD-GWF, defendant Sangalang was charged with the unlawful possession of an unregistered machine gun.

In case No. 2:08-cr-141-JCM-GWF, defendants Sangalang, Patton, Alfredo Flores, Roderick Jones, Robert Williams and Derek Jones were charged with conspiracy to interfere with commerce by robbery pursuant to the Hobbes Act, 18 U.S.C. § 1951(a). Defendants were also charged with conspiracy to possess with the intent to distribute cocaine and possession of a firearm in furtherance of a drug trafficking crime.

These indictments stem from an undercover sting operation conducted by agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF"). Hustler Tattoo, a tattoo parlor, which the ATF opened and outfitted with video and audio equipment, provided the cover for the operation. ATF agents Peter McCarthy and Mark Gomez participated as the principle undercover operatives in the sting. The sting lasted from February 2007 until May 15, 2008, during which time, the ATF agents and two paid informants arranged firearms and drug deals with criminal targets. The transactions were recorded on audio/video equipment.

Commencing on November 1, 2007, the ATF agents started purchasing illegal firearms from defendants Christopher Sangalang and Deandre Patton. Sangalang and Patton began to develop a personal relationship with Agent Gomez as they increasingly frequented Hustler Tattoo.

In the beginning of 2008, Sangalang and Patton began working at Hustler Tattoo as tattoo artists. While at the tattoo parlor, Sangalang and Patton often bragged to Agent Gomez about the many crimes they had committed. Sangalang also admitted that he had belonged to an infamous and violent criminal gang in Los Angeles. During this time, Sangalang repeatedly tried to initiate sales of drugs with the ATF agents. After receiving authorization, the ATF agents purchased one and a one-half ounces of methamphetamine from Sangalang and Patton.

The undercover agents were also at that time dealing with another suspected criminal, Donte Reed. Reed informed the agents that he had a "home invasion crew" interested in doing a robbery. When Sangalang heard the agents met with Reed, he became distressed at his exclusion. He

informed the agents that he could get a crew together if Donte could not.

Previous to this incident, one of Sangalang's friends, defendant Alfredo Flores, told agent McCarthy that he had a crew willing to do robberies. The agents decided to pitch a home invasion robbery to Flores. After they described the general idea of the robbery to Flores, he responded that he was interested and could get a crew together. Soon after, Sangalang expressed a desire to participate in the robbery. He also questioned Flores's ability to orchestrate the robbery.

It eventually became settled that Sangalang would put together a team to carry out the robbery. The agents, together with Sangalang and Flores, began planning the robbery of a fictitious drug house. Agent McCarthy and Sangalang discussed the logistics and complications involved in conducting such a robbery. Both felt it might be necessary to kill any persons in the stash-house. Sangalang suggested that once they had killed any guards, he would leave some drugs in the house, then burn the house down. After formulating a specific plan, Sangalang went about selecting members of his team.

Over a period of one month, Sangalang met on several occasions with the undercover agents to discuss the specifics of the plan. On May 12, 2008, the agents met with Sangalang, Flores, Patton, and defendant Roderick Jones to finalize plans for the robbery. The video/audio recording of the meeting shows the discussion led by one of the agents while Sangalang and Patton actively participate. In the meeting, Patton and Sangalang discussed the most efficient way to kill an "inside guy" at the stash-house. Sangalang also taught the team how to properly tie someone up. Defendant Jones offered the suggestion that they pose as police officers for cover. He also discussed cutting the throats of the persons guarding the stash house.

On May 15, 2008, defendants assembled at Hustler's Tattoo in preparation to commit the robberies. The defendants brought their own firearms, and had two bags of zip ties and a radio scanner. The defendants drove in a vehicle separate from the undercover agents to the planned rendevous location. Defendants were met there by the ATF SWAT team and arrested.

## ANALYSIS

The United States Supreme Court first recognized the potential for dismissal based on

outrageous government conduct that violates the Due Process Clause of the Fifth Amendment, in *United States v. Russell*. 411 U.S. 423 U.S. 423, 431-32 (1973). However, such relief has been limited to extreme cases where the government's conduct clearly violates fundamental fairness and shocks the universal sense of justice. *United States v. Williams*, 547 F.3d 1187,1199 (9th Cir. 2008). The Ninth Circuit has recognized outrageous conduct where government agents engineer and direct a criminal enterprise from start to finish or instigate the generation of new crimes solely for the sake of pressing criminal charges against the defendant. *United States v. Gobart*, 783 f.2d 1428, 1436 (9th Cir. 1986).

In *United States v. Bonanno*, the Ninth Circuit cited five factors, when satisfied, indicate that the governmental conduct was acceptable:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

852 F.2d 434, 437-438 (9th Cir. 1988).

**A.     Robbery Conspiracy Charged in Case No. 2:08-cr-163-JCM-GWF**

    **1.     Defendants Were Heavily Involved in a Series of Similar Crimes Prior to the Robbery.**

From the sting's inception, defendants demonstrated a willingness to participate in diverse criminal activities including the illegal sale of firearms, drug trafficking, and gang related violence. Flores told the agents that he had a crew of people willing to commit robberies. After Sangalang heard about a potential robbery he complained about being left out and advocated his ability to execute any robbery scheme. Such facts demonstrate that Sangalang and Flores were actively engaged in diverse criminal actions for financial gain.

Furthermore, Sangalang, Flores, Patton, and Jones all participated in planning the robbery.

**James C. Mahan**
**U.S. District Judge**

- 4 -

Sangalang personally selected and recruited the robbery team. He further supplemented the plan with criminal insight, including the idea to leave some drugs in the stash-house and then burn it down. Patton and Sangalang suggested different methods to efficiently kill a supposed "inside man" who the group had decided must be killed. Jones helped to formulate an attack plan including the disguise of one of the assailants as a police officer. All of this evidence corroborates the fact that each defendant, independent of the ATF agents, encouraged, planned, and attempted to execute aspects of the robbery.

### 2. Defendants had the Resources, Experience, and Motive to Commit the Robbery Irrespective of the ATF Agents Participation.

The overwhelming evidence confirms that the defendants would continue their criminal activity regardless of the ATF agents. Each of the defendants admitted to the agents they had been involved in acts of gang related violence and other crimes. Flores and Jones both admitted to have committed prior robberies, including highjacking vehicles. Flores even claimed to head up a team or a unit that specialized in robbery. The only thing the ATF agents provided was an immediate target and an initial general plan. Once provided with a concrete target, defendants readily set about planning and preparing to commit the crime.

### 3. The Undercover Agents Expressly Sought Out and Infiltrated A Suspected Criminal Organization.

The ATF agents intentionally portrayed themselves as the operators of a criminal enterprise who were involved in the purchase of illegal firearms and narcotics. They did so with the clear intent to infiltrate established criminal organizations. All the defendants involved in the robbery conspiracy had referenced their criminal past and demonstrated a keen willingness to continue such criminal activities.

Consequently, the government conduct of ATF agents McCarthy and Gomez, in diverting defendants' criminal intentions towards a fictitious drug house was acceptable within the Ninth Circuit's *Bonanno* test.

James C. Mahan
U.S. District Judge

- 5 -

B.  **The Questionable Allegation, That Agent McCarthy Allegedly Used Illegal Drugs During The Undercover Operation, Is Insufficient to Support Dismissal of the Indictments.**

There is no case that holds an indictment should be dismissed because a government agent engages in illegal drug use during an undercover operation; especially where no showing is made that the agent's misconduct affected the defendant's behavior in committing the charged offense. There is simply no evidence that Agent McCarthy's alleged illegal drug use played any role in the firearms or narcotics transactions or the robbery conspiracy.

Furthermore, the defendants have not met their burden of proof that Agent McCarthy did, in fact, use illegal drugs. Nevertheless, even if it was proven that Agent McCarthy used illegal drugs, dismissal of the indictments would not be justified on this ground.

C.  **The Government's Alleged Failure to Preserve Potentially Exculpatory Audio/Video Evidence Does Not Warrant Dismissal.**

Defendants contend that the indictments should be dismissed because the ATF agents failed to preserve thousands of hours of video/audio recordings made at Hustler's Tattoo during the undercover operation. Throughout the operation, ATF agents McCarthy and Gomez taped and recorded all interactions at the tattoo parlor. They kept all DVDs which they felt contained information of "evidentiary value" i.e, illegal firearms and narcotics deals, and the meetings concerning the robbery conspiracy. Unless a DVD contained something that the agents knew had evidentiary value, it was discarded.

In *California v. Trombetta*, the Supreme Court held that the due process clause provides criminal defendants with a constitutionally guaranteed access to evidence. 467 U.S. 479, (1984). As part of that guarantee, the Supreme Court has recognized some duty to preserve evidence favorable to the accused. *Id*. The Ninth Circuit has ruled the violation of constitutional due process by failing to preserve evidence only when: (1) the unavailable evidence possessed exculpatory value that was apparent before the evidence was destroyed; (2) the defendant could not obtain comparable evidence by other reasonably available means; and (3) the government acted in bad faith in failing to preserve

the evidence. *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

Defendants cannot meet this test. Much of the evidence alleged to have been recorded and discarded involved alleged interactions with the defendants and the ATF paid informants. Such information could have been reasonably available by calling one of the informants as a witness and subjecting that witness to examination. Moreover, ATF agents testified that they were unaware of any dealings between the ATF informants and the defendants, which might impact the case. Therefore, the DVDs did not posses any exculpatory value that was apparent before they were destroyed. Accordingly, defendants' motion to dismiss their indictments due to the failure to preserve every DVD must be denied.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Magistrate Judge George Foley's report and recommendation (#399) is AFFIRMED in its entirety.

DATED this 2nd day of December, 2009.

_____
**UNITED STATES DISTRICT JUDGE**