UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | 2:08-CR-163 JCM (GWF) |
|---|---|
| Plaintiff, | |
| v. | |
| CHRISTOPHER SANGALANG, ALFREDO FLORES, DEANDRE PATTON, ROD JONES, ROBERT WILLIAMS, DEREK JONES, | ORDER |
| Defendants. | |

Presently before the court is defendants Christopher Sangalang, Roderick Jones, and Deandre Patton's motion to dismiss based on outrageous government conduct (Doc. #104).[1] The United States Government filed its response on October 1, 2008 (Doc. #175). United States Magistrate Judge Foley provided a report and recommendation as to this motion. (Doc. #399). Defendants Sangalang, Flores and Patton filed objections (Doc. #421) to the report and recommendation on December 16, 2009. After the court conducted evidentiary hearings, Magistrate Judge Foley recommended that defendants' motion to dismiss for outrageous government conduct (Doc. #104) be denied. Defendants' motion involves several related indictments. This order relates only to Case No. 2:08-cr-00163-JCM-GWF. In this case, defendants were charged with conspiracy to interfere

---

[1] Roderick Jones also filed this motion, but he has since plead guilty to count one of the indictment, conspiracy to interfere with commerce by robbery. This case includes other defendants, but only defendants Sangalang, R. Jones and Patton filed this motion to dismiss based on outrageous government conduct.

**James C. Mahan**
**U.S. District Judge**

with commerce by robbery pursuant to the Hobbes Act, 18 U.S.C. § 1951(a). Defendants were also charged with conspiracy to possess with the intent to distribute cocaine and possession of a firearm in furtherance of a drug trafficking crime.

I.  Background

The indictment in this case stems from the findings of an undercover sting operation conducted by agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF"). Hustler Tattoo, a tattoo parlor provided the cover for the operation. ATF agents Peter McCarthy and Mark Gomez participated as the principle undercover operatives in the sting. The sting lasted from February 2007 until May 15, 2008, during which time, the agents and two paid informants arranged for illegal firearm and drug deals with criminal targets. The transactions were recorded on audio/video equipment.

Commencing on November 1, 2007, the agents started purchasing illegal firearms from defendants, who eventually developed a personal relationship with agent Gomez as they increasingly frequented Hustler Tattoo.

In the beginning of 2008, defendants began working at Hustler Tattoo as tattoo artists. While at the tattoo parlor, defendants often bragged to agent Gomez about the many crimes they had committed. Sangalang admitted that he belonged to an infamous and violent criminal gang in Los Angeles. During this time, Sangalang repeatedly tried to initiate sales of drugs with the agents. After receiving authorization, the agents purchased one and a one-half ounces of methamphetamine from Sangalang and Patton.

The undercover agents were also dealing with another suspected criminal, Donte Reed. Reed informed the agents that he had a "home invasion crew" interested in doing a robbery. When Sangalang heard the agents met with Reed, he became distressed at his exclusion. Sangalang informed the agents that he could get a crew together if Reed could not.

Prior to this incident, one of Sangalang's friends, Alfredo Flores, who is also a defendant in this case, told agent McCarthy that he had a crew willing to do robberies. The agents decided to pitch a home invasion robbery to Flores. After they described the general idea of the robbery to Flores, he

James C. Mahan
U.S. District Judge

- 2 -

1  responded that he was interested and could get a crew together. Soon after, Sangalang expressed a
2  desire to participate in the robbery.

3  It eventually became settled that Sangalang would put together a team to carry out the
4  robbery. The agents, together with Sangalang and Flores, began planning the robbery of a fictitious
5  drug house. Agent McCarthy and Sangalang discussed the logistics and complications involved in
6  conducting such a robbery. Both felt it might be necessary to kill any persons in the stash-house.
7  Sangalang suggested that once they had killed any guards, he would leave some drugs in the house,
8  then burn the house down. After formulating a specific plan, Sangalang went about selecting
9  members of his team.

10  Over a period of one month, Sangalang and Flores met on several occasions with the
11  undercover agents to discuss the specifics of the plan. On May 15, 2008, defendants assembled at
12  Hustler's Tattoo in preparation to commit the robberies. Defendants brought their own firearms, and
13  had two bags of zip ties and a radio scanner. Defendants drove in a vehicle separate from the
14  undercover agents to the planned rendevous location. Defendants were met there by the ATF SWAT
15  team and arrested.

16  II.  Legal Standard

17  In order to succeed on a claim for outrageous government conduct, a defendant must establish
18  that the government's conduct "violates fundamental fairness and is 'shocking to the universal sense
19  of justice mandated by the Due Process Clause of the Fifth Amendment.'" *United States v. Williams*,
20  547 F.3d 1187, 1199 (citing *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir, 2003)).

21  *Gurolla* held that "[t]his standard is met when the government engineers and directs a
22  criminal enterprise from start to finish." However, the standard "is not met when the government
23  merely infiltrates an existing organization, approaches persons it believes to be already engaged in
24  or planning to participate in the conspiracy, or provides valuable and necessary items to the venture."
25  *Id*. Therefore, law enforcement conduct becomes constitutionally unacceptable where government
26  agents engineer and direct a criminal enterprise from start to finish or when government conduct
27  constitutes, in effect, the generation of new crimes merely for the sake of pressing criminal charges
28

**James C. Mahan**
**U.S. District Judge**

- 3 -

1   against the defendant. *United States v. Bogart*, 783 F.2d 1428, 1436 (9th Cir. 1986).

2   The Ninth Circuit relies on a five factor test when determining whether governmental conduct is outrageous. If the government satisfies the following five factors, then its conduct is considered acceptable: (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity. *United States v. Williams*, 547 F.3d 1187, 1199-1200 (9th Cir. 2008) citing *United States v. Bonanno*, 852 F.2d 434, 437-38 (9th Cir. 1988).

III.   Analysis

**A. The Government's Conduct in the Robbery Sting Operation is Not Outrageous**

*1. The Defendants were Already Involved in a Continuing Series of Similar Crimes, or the Charged Criminal Enterprise was Already in Progress at the Time the Government Agent became Involved*

The agents had a reasonable basis to believe that defendants Sangalang and Flores would be receptive to the proposed robberies based on their prior statements and conduct. Agent Gomez testified that the robbery pitch was made to Flores and Sangalang because of their previous bragging regarding their violent gang affiliations. Specifically, Sangalang bragged that he was affiliated with the "Seven Four Hoover Crips," a violent street gang out of Los Angeles. Defendants point out in their opposition that agent Gomez did not specify Flores' exact gang affiliation in his testimony. However, that omission does not change the fact that Flores said he had gang affiliations. Additionally, both defendants had already engaged in selling illegal firearms and drugs to the agents.

Agent Gomez told Flores about the robbery idea, and Flores expressed immediate interest in taking part in it. He told agent Gomez he had a crew of individuals who were willing to commit robberies. Moreover, agent Gomez originally pitched the idea to another person, Donte Reed. When Sangalang learned of that the plan had been proposed to Reed and not him, Sangalang told agent

**James C. Mahan**
**U.S. District Judge**

- 4 -

Gomez that he would like to "get a crew together" if Reed was unable to do it. As the magistrate judge pointed out, Sangalang expressed his desire to be involved in the agent's robbery plans prior to agents' explanation of the details of the robbery. The recordings confirm that neither Flores nor Sangalang expressed reluctance about committing the robberies.

*2. The Agent's Participation was Not Necessary to Enable the Defendants to Continue the Criminal Activity*

Defendants were fully capable of going forth with the robbery without the agents' participation. Sangalang even admitted that his crew had experience doing armored car robberies. Sangalang and Flores were responsible for putting together their "crews." The members of the crew supplied many of their own weapons and other equipment such as zip-ties, ski masks and a police radio scanner.

Defendants presented many original ideas to the agents regarding how the robbery should be conducted. Such ideas included impersonating police officers and how and where to kill the "inside guy" at the stash house.

Defendants argue that the defendants would not have engaged in the robbery had it not been for the government's involvement. Nevertheless, this factor is not about whether the government originally devised the plan. Rather this factor focuses on whether the defendants have the ability to continue or carry out the crime without the governments involvement.

Here, the agents merely provided an immediate target and an initial general plan. In consideration of defendants' significant contributions to the robbery plans, it is apparent that defendants could have planned and committed or continued to carry out the robbery regardless of the agents participation.

*3. The Agent used Artifice and Stratagem to Ferret out Criminal Activity*

Upon observing defendants Sangalang and Flores' behavior, the agents made the strategic decision to pitch the robbery plan to them. Defendants were already involved in selling narcotics and illegal firearms and bragged about their gang affiliations. This sting operation had the potential to prevent defendants from continuing to pursue such criminal activities.

**James C. Mahan**
**U.S. District Judge**

*4. The Agent Infiltrated a Criminal Organization*

The defendants were involved in a criminal organization that consisted of selling narcotics and illegal firearms. Furthermore, the defendants suggested they were involved and/or connected to gangs. Therefore, the evidence shows that the agent infiltrated a criminal organization.

*5. The Agent Approached Persons Already Contemplating or Engaged in Criminal activity*

As already described above, the defendants were actively involved in criminal activity, such as selling drugs, prior to being propositioned about taking part in a robbery. Criminal activity is not limited to felony convictions.

Upon review of the evidence, the government meets all five factors set forth in *United States v. Bonanno*, 852 F.2d 434, 437-38 (9th Cir. 1988).

**B.   The Questionable Allegation, That Agent McCarthy Allegedly Used Illegal Drugs During The Undercover Operation, Is Insufficient to Support Dismissal of the Indictments.**

The cases that defendants cite do not support dismissal of the indictment based upon an agent allegedly using illegal drugs. Although the cases acknowledge some cause for concern when there was a causal relationship between the government's conduct and the defendant's criminal behavior, the courts still held that the agent's conduct did not warrant dismissal of the case. There is simply no evidence that agent McCarthy's alleged illegal drug use played any role in the firearms or narcotics transactions or the robbery conspiracy, and even if there was, case law still would not support a dismissal of the case.

Furthermore, the defendants have not met their burden of proof that agent McCarthy did, in fact, use illegal drugs. Defendants suggest that if the government did not destroy videos, defendants could prove that agent McCarthy used illegal drugs. Even if the missing video could establish that agent McCarthy used drugs, dismissal on these grounds would not justify dismissing the case.

. . .

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

- 6 -

1  **C.    The Government's Alleged Failure to Preserve Potentially Exculpatory Audio/Video**
2  **Evidence**

3  *1. Facts concerning the audio/video evidence*

4  Throughout the operation, agents McCarthy and Gomez taped and recorded all interactions at the tattoo parlor. They kept all DVDs which they felt contained information of "evidentiary value" i.e, illegal firearms and narcotics deals, and the meetings concerning the robbery conspiracy.

7  The agents stated that they recorded the transactions involving firearms and narcotics or meetings about the proposed stash house robberies. After recording such transactions, the agents would mark the DVDs for identification purposes and place them in the ATF's evidence vault.

10  The agents admitted that they did not watch all of the recorded DVDs, which amounted to about 6,000 hours of recordings. Agent Gomez testified that the agents did not attempt to review the hours of recordings when no government agents were present, and therefore these DVDs were discarded because the agents did not know they had "evidentiary value." Unless a DVD contained interaction between the agents and the defendants, it was discarded.

15  Additionally, the agents did not discuss the decision to discard the DVDs with their ATF supervising agents or with the assistant United States Attorney assigned to the investigation. Although the 1989 ATF procedure order manual requires all electronic evidence to be preserved regardless of its perceived evidentiary value, ATF supervising agent Donald York testified that this procedure is outdated. Mr. York stated that the ATF no longer requires agents to preserve electronic surveillance unless it has known evidentiary or exculpatory value.

21  Defendants contend that the indictments should be dismissed because the agents failed to preserve "thousands of hours" of video/audio recordings made at Hustler's Tattoo during the undercover operation. Specifically, defendants argue that the agents discarded recordings of interactions between Mr, Beckworth, an informant, and the defendants.

25  Defendants argue that the government's failure to preserve all of the DVDs prejudice them and prevent them from establishing their entrapment defense. Defendants stated that Mr. Beckworth supplied weapons and methamphetamine to them, and asked them to sell such weapons and drugs

**James C. Mahan**
**U.S. District Judge**

- 7 -

1  to the agents. Allegedly, Mr. Beckworth asked the defendants to sell to the agents because the
2  defendants could get a better price from the agents. Consequently, defendants believe the missing
3  evidence would confirm and support their entrapment defense.

4        2.      *Due Process Violation Analysis*

5        The Supreme Court held that "[s]uppression by the prosecution of evidence favorable to an
6  accused upon request violates due process where the evidence is material either to guilt or to
7  punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373
8  U.S. 83, 87 (1963). A defendant's right to due process is violated "if the unavailable evidence
9  possessed 'exculpatory value that was apparent before the evidence was destroyed, and [is] of such
10 a nature that the defendant would be unable to obtain comparable evidence by other reasonably
11 available means.'" *U.S. v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) quoting *California v.*
12 *Trombetta*, 467 U.S. 478, 489 (1984).

13       The Supreme Court specifically noted that the analysis set forth in *Brady* is inapplicable
14 where the destroyed evidence only potentially exonerated the defendant. *Arizona v. Youngblood*,
15 488 U.S. 51, 58 (1988). Therefore, if the evidence is "potentially exculpatory," then the defendants
16 must also demonstrate that the government "acted in bad faith in failing to preserve the potentially
17 useful evidence." *Cooper*, 983 F.2d at 931 quoting *Youngblood*, 488 U.S. at 58 (1988).

18       The holdings set forth in *Trombetta* and *Youngblood* essentially mean that "the presence or
19 absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the
20 evidence at the time it was lost of destroyed." *Cooper*, 938 F.2d at 931. If the government knew that
21 the evidence was exculpatory at the time it destroyed the evidence, then establishing bad faith is not
22 necessary. However, if the government only knew that the evidence was potentially exculpatory, then
23 the defendants must establish bad faith.

24       a. <u>The evidence at issue may be potentially exculpatory</u>

25       Here, there is no evidence demonstrating that the agents knew the destroyed DVD recordings
26 were exculpatory at the time the agents destroyed the DVDs. Arguably, the agents could have
27 recognized that the DVD recordings might contain relevant evidence because the agents knew

28

**James C. Mahan**
**U.S. District Judge**

- 8 -

1  defendants had contact with Mr. Beckworth and other members of the investigation inside the tattoo
2  parlor when the agents were not present.

3  Moreover, even if the recording existed, this evidence would not exonerate the defendants.
4  The defendants suggest that the recording would evidence monetary transactions between the
5  defendants and Mr. Beckworth. Agent Gomez testified that Sangalang and Patton made repeated
6  attempts to get agents to purchase narcotics from them. Sangalang even told the agents that he had
7  sources from Hawaii and Georgia who could provide narcotics. Patton also testified that he and
8  Sangalang voluntarily sold the drugs to the agents on behalf of Mr. Beckworth in order to get a better
9  price for the drugs. Therefore, at most, the defendants have established that the destroyed DVD
10 recordings were potentially exculpatory.

b. Defendants cannot establish bad faith on the part of the agents

Throughout this investigation the agents created a policy whereby they discarded all DVD recordings where agents were not present. In this investigation, it was the agents' normal practice to automatically discard DVD recording in which agents were not present. The agents did not methodically pick and choose which recordings to destroy. While the court hardly believes this was an intelligent practice, the agents had a rationale for the practice and applied the practice consistently.

The rationale behind this practice is that the agents did not believe these DVD recordings contained any evidentiary value because the defendants were not reacting with the agents. Therefore, in failing to preserve these DVD recordings, the agents "were acting in good faith and in accord with their normal practice." *Trombetta*, 467 U.S. at 479 (1984) quoting *Killian v. United States*, 368 U.S. 231, 242 (1961).

Furthermore, the agents "did not destroy" the DVDs "in a calculated effort to circumvent the due process requirements" established by *Brady v. Maryland* and its progeny. *Trombetta*, 467 U.S. at 488 (1984). The agents had a good faith belief that any recordings that did not include agents had simply no evidentiary value. The agents lacked the requisite bad faith in destroying evidence that might be useful to the defendants.

**James C. Mahan**
**U.S. District Judge**

- 9 -

For the reasons set forth above,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendants' motion to dismiss based on outrageous government conduct (Doc. #104) is DENIED and the court adopts Judge Foley's report and recommendation (Doc. #399).

DATED this 18th day of March, 2010.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**